(No. 61239.—
(No. 63683.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HECTOR REUBEN SANCHEZ, Appellant.

*Opinion filed December 19, 1986.—Rehearing denied January 30, 1987.*

240

242

244

248

GOLDENHERSH and SIMON, JJ., and CLARK, C.J., concurring in part and dissenting in part.

George B. Collins, Christopher Bargione, and Donald L. Bertelle, of Collins, Uscian & Bertelle, of Chicago, and Lyn Cima, of Waukegan, for appellant.

Neil F. Hartigan, Attorney General, of Springfield

(Roma J. Stewart, Solicitor General, and Mark L. Rotert and Joan G. Fickinger, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Hector Reuben Sanchez, along with a codefendant, Warren Peters, Jr., was charged under an indictment with two counts of murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(3)), aggravated kidnaping (Ill. Rev. Stat. 1983, ch. 38, par. 10—1(a)(1)), rape (Ill. Rev. Stat. 1983, ch. 38, par. 11—1(a)), deviate sexual assault (Ill. Rev. Stat. 1983, ch. 38, par. 11—3(a)), and attempted murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a)). The charges stemmed from the abduction and slaying of Michelle Thompson on February 3 and 4, 1984. Rene Valentine, an acquaintance of Ms. Thompson, was shot and wounded during the incident. Peters' case was severed, and he was tried and convicted of murder on July 14, 1984.

Sanchez, who was tried later, was found guilty of all charges by a jury in the circuit court of Lake County. He waived a jury as to the first phase in his sentencing hearing, and the trial judge found the existence of statutory aggravation factors. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6).) The jury then determined that there were no mitigating factors sufficient to preclude imposition of the death penalty, and the defendant was sentenced to death. He was also given concurrent terms of 60 years for the other offenses. The sentence was stayed (87 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603).

Subsequently, Sanchez sought relief under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401). His petition was dismissed without an evidentiary hearing. An appeal from that dis-

missal was taken to the appellate court, and we granted a transfer of the appeal to this court under Rule 302(b) (87 Ill. 2d R. 302(b)). That appeal has been consolidated with his direct appeal, and both cases are now before this court.

Rene Valentine testified that on the evening of February 3, 1984, he went to a nightclub known as D. Laney's in Gurnee, Illinois. While there, he met the deceased, Michelle Thompson. Valentine knew her because she was dating Pablo Martinez, with whom Valentine was then living. At about 12:30 a.m., Valentine and Thompson went out to Valentine's car in the parking lot. Two men approached the car and entered it from opposite sides. One, a black man, grabbed Thompson, while the other, a Puerto Rican, produced a gun. Thompson was taken into another vehicle by the black man. The Puerto Rican escorted Valentine at gunpoint to a more secluded area of the parking lot and shot him twice in the chest but did not kill him. Valentine later identified the assailant as the defendant, Hector Reuben Sanchez.

Warren Peters, Jr., the black man in Valentine's narrative, provided the bulk of the evidence against Sanchez. He had been tried and convicted of the murder of Thompson before Sanchez' trial but was not sentenced until after he testified for the State against Sanchez. He testified that on February 3, Peters, Sanchez and another person named Forest Heinz had been planning to burglarize a restaurant in the vicinity of D. Laney's. They had "cased" the restaurant earlier in the evening, and later Sanchez and Peters returned to D. Laney's. They were sitting in Peters' car in the parking lot when they spotted Valentine and Thompson. Sanchez proposed going over and talking to them. Peters did not know that Sanchez had a gun, or what Sanchez' intentions were.

Sanchez instructed Peters to take the woman to his

car, while Sanchez went off with Valentine. Within seconds, Peters heard what sounded like a gunshot. Sanchez returned to Peters' car, produced a pair of handcuffs from his coat and put them on Thompson. They then proceeded to Sanchez' home. Sanchez took Thompson into the house. By the time Peters entered, Thompson was nude from the waist down. Sanchez then raped her on the family-room floor. He then produced a nylon strap, tied Thompson's still-handcuffed wrists to her feet and dragged her behind a chair. The two men then went outside to put Peters' car in the garage. When they returned, they discovered that Thompson had escaped.

Peters and Sanchez went outside to search and found that she was in the back yard of the house next door. She was near the back door, and was screaming "Help me." According to Peters, Sanchez went over and dragged her back by the handcuffs. Sanchez then told Peters he would have to go back and "blow the neighbors' heads off" because the girl had been pounding on the door and had probably been seen. Sanchez took a gun from the kitchen and went out. He returned a few minutes later, saying he had explained the disturbance.

Sanchez then carried Thompson to the basement. Peters went down several minutes later. He observed the still half-nude woman leaning over the washing machine with Sanchez behind her. She had been gagged with a strip of cloth. Sanchez asked Peters if he "wanted any" and, when Peters declined, announced that he would "have to kill her." Sanchez strangled her with a nylon strap. He also wrapped a coat hanger around her neck, slammed her head to the floor and kicked the lifeless body in the side.

Peters also testified that when the two men began to move the body, he noticed that she had defecated on the basement floor. Peters went for some tissue, and

Sanchez cleaned up the excrement. They then dragged the body upstairs. Sanchez burned Thompson's clothes and jewelry in the fireplace. The body was placed in the backseat of Sanchez' car. The men drove to an isolated location in Wisconsin and disposed of the body. As Sanchez drove away, he ran over the body.

After returning to Sanchez' house, Peters took Sanchez' car to his home and kept it for several days, leaving his own car in Sanchez' garage. When Peters' car was returned to him, the formerly white top had been painted black.

Gene Gonyo, Sanchez' neighbor, also testified. He said that he was awakened by his dog barking at about 1:30 a.m., February 4. He saw a man and woman near his back door. The woman was nude from the waist down and the man was wearing a green jacket. Gonyo heard a scream and heard the woman say the word "Larry," which was the nickname by which Sanchez was known to Gonyo. He did not hear cries of "Help me" at any time. Gonyo watched the pair move to the front of his house and walk in the direction of Sanchez'. The woman was walking behind Sanchez. She did not appear to be wearing handcuffs. Gonyo thought to call the police, but was interrupted by a knock at the door. It was Sanchez, who apologized for the disturbance and explained "she either had an epileptic seizure, or she was on drugs, or she was on booze." Sanchez did not have a gun, but as he left he turned and picked up something "dark." Gonyo could not tell what the object was. In Gonyo's estimation, only a few seconds elapsed between the time he saw Sanchez and the girl, and the time when Sanchez was at his front door. There would not have been enough time for Sanchez to have returned to his house, have a conversation, locate a gun and return.

At about 2:15 a.m., Gonyo was again awakened by the barking dog. He saw a car he recognized as

Sanchez' pull out of the driveway with the headlights off. The car paused at the corner, then turned toward Wisconsin.

The balance of the prosecution's evidence was of a forensic or otherwise scientific nature. Briefly summarized, the doctor who performed the autopsy testified that the cause of death was strangulation with a fairly wide ligature. Other bruises and abrasions were found which were consistent with events as described by Peters. There was also evidence of anal penetration.

However, the examination found no trace of excrement. Neither was there evidence of injury to the genitalia, as is commonly found in rape victims. Swabs were taken from all the victim's body cavities, but only the vaginal area showed the presence of semen. Later testimony established that chemical factors in the semen were consistent with Sanchez' blood type.

Another witness was an FBI microscopic analysis expert. His investigation involved comparisons of hairs, fibers and other materials collected from the victim's body and the scene of the crime. Briefly stated, fibers found on the body were consistent with fibers from a number of sources in Sanchez' house and car. Also, the victim's hair was consistent with hair found in Sanchez' house and car, Peters' car and on Gonyo's property. Finally, buttons and fibers consistent with the victim's clothing were found in Sanchez' house.

An FBI paint expert also testified that the paint which had been used on the top of Peters' car was consistent with paint in cans found in Sanchez' garage. Other witnesses testified that they had seen handguns and handcuffs in Sanchez' possession.

For the defense, a witness testified that both Sanchez and Valentine applied for jobs with her company on the same day. Valentine had denied knowing Sanchez. A woman who worked as a bartender testified

that a man who appeared to be Sanchez was in her saloon on the night of February 3. A patron of the bar identified Sanchez as having been there but was uncertain of the date.

The proprietor of D. Laney's testified that he had seen Valentine go in and out of the bar's inner door several times during the night. From his vantage point, he could not say whether Valentine went outside each time, only that he at least went to the vestibule area. He also did not see Sanchez at D. Laney's on February 3. A D. Laney's bartender testified that drugs were commonly trafficked there. The common method was for dealers to "take orders" at the bar, go to their cars for the merchandise and return.

Pablo Martinez testified that he was in love with Michelle Thompson. Martinez, who was underage, had been to D. Laney's in the past because Valentine knew the doorman. On the night of Thompson's slaying he had spoken with Valentine but had been told he would not be able to get in that night. He had also received a call from Thompson during the evening. He denied any feelings of jealousy because Thompson and Valentine were at D. Laney's together.

Based upon these facts, the jury returned a verdict of guilty on all counts. The death penalty hearing was set to commence the next day. Upon reconvening, the court announced that Sanchez had attempted suicide during the night by breaking his eyeglass lens and attempting to cut his arm. Defense counsel, asserting that Sanchez was distraught and unable to cooperate, moved to discharge the jury and postpone the sentencing hearing. The court determined that Sanchez, who had received medical attention and was present, was fit to proceed and denied the motion.

The defendant waived a jury determination of whether aggravating factors were present. The court

then found as an aggravating factor that Thompson had been killed in the course of another felony and that Sanchez had actually performed the acts causing her death.

The jury then reconvened and heard testimony for the second phase of the death penalty hearing. The focus of the State's evidence in aggravation was on the previously unsolved murder of Sharon Egerer in Milwaukee in May 1975. Francisco Morales, a former business partner and acquaintance of Sanchez, testified that Sanchez had been involved in a relationship with Egerer from about 1970 or 1971. In May of 1975 Morales learned that Egerer had initiated a paternity action against Sanchez. Sanchez attempted to enlist Morales to testify on his behalf.

William Garris testified that he participated in the Egerer killing. He and Sanchez went to Milwaukee on a Friday in May of 1975. They met Egerer after she left work and followed her to her apartment. Sanchez went inside with her and sometime later summoned Garris. Garris saw Egerer's body lying in a pool of blood. Sanchez admitted killing her, and threatened to kill Garris if he did not provide an alibi.

The next witness was Suzi Holton Eckerle. She testified that when Garris and Sanchez returned to her house on May 30, 1975, Sanchez told her he had "taken care of Sharon." He demanded that she too provide him with an alibi. When the police investigated the Egerer slaying, Sanchez, Garris and Eckerle claimed that they had been at Eckerle's house the entire evening of the incident. Shortly after the Egerer crime, Sanchez and Eckerle became intimate and carried on a relationship until 1981. It ended in a dispute over another woman. When news of Sanchez' involvement in the Thompson homicide came out, Garris and Eckerle came forward.

Sanchez, who did not testify at his trial, did take the

stand at the sentencing hearing. He has never learned to read and write. Nonetheless, he managed to keep a job at Johnson Motors for 14 years and, through thrift, saved enough money to purchase land and build the house in which he lived.

Sanchez testified about the Egerer homicide. He claims that when Garris was told of the paternity suit, he proposed going to Milwaukee and talking to Egerer. When they located her, she refused to talk to Sanchez, but agreed to speak with Garris. It was Garris who went into Egerer's apartment while Sanchez waited outside. When Garris came out he was covered with blood. He told Sanchez he had killed Egerer because she intended to extort money from Sanchez. Garris, knowing that Sanchez had saved a bit of money, hoped to earn Sanchez' favor.

When they returned to Eckerle's house, Garris told her that Sanchez had committed the crime. Over the years, Eckerle refused to let Sanchez explain. Sanchez had never come forward because he realized that, due to the paternity-suit motive, he would be suspected of having committed the murder.

Sanchez also testified that Forest Heinz and Peters had committed a number of burglaries. Sanchez denied involvement but stated that he occasionally let Heinz and Peters borrow tools. He also admitted having had an affair with Heinz' wife but had terminated it when he met Heinz. He stated that on February 3, 1984, Heinz and Peters were planning to burglarize a restaurant near D. Laney's. They kept their equipment and masks at Sanchez' house and had access to the house because they knew where Sanchez kept a spare key. Sanchez had been invited to participate but declined. He did not want to be around when Heinz and Peters came for their burglar tools.

Sanchez stated that on the night of February 3 he

went to several bars in Wisconsin and Lake County. He eventually met a woman who returned to his house with him. After a time, Heinz walked in and sat down. Sometime later, when Sanchez was out of the room, the woman disappeared. Sanchez noticed her shoes and pants near the open patio door. He followed her tracks in the snow to Gonyo's back yard and brought her back to his house. He then went over and apologized to Gonyo.

When he returned, Heinz was still there. A short while later the woman left and, with Heinz still present, Sanchez fell asleep on the sofa. In the morning Sanchez discovered that Peters' car was in the garage and his own car was missing. The next day, Heinz came over with several cans of black paint, and he and Sanchez painted the top of Peters' car. Sanchez later spoke with Peters, who explained that he had left his car at Sanchez' because it had been in a hit-and-run accident. Sanchez saw no signs of damage. Sanchez cleaned out the back seat and trunk of Peters' car and returned it to him. Sanchez concluded his testimony by denying any involvement in the Thompson slaying.

Based upon this testimony, the jury decided to impose the death penalty.

The defendant's initial contention is that the evidence was insufficient to prove him guilty beyond a reasonable doubt. He argues that Peters' testimony is subject to serious question, especially in light of the fact that he testified prior to his own sentencing and believed he might escape the death penalty by cooperating in the case against Sanchez. Defendant also notes that Mr. Gonyo heard no screams of "Help me," but rather heard the woman at his back door call the defendant by his nickname, "Larry." He argues that the sequence of events described by Peters would not lead to social introduction, which would have been the only way Thompson

could have learned that he was called "Larry." Also, Mr. Gonyo did not see the woman being dragged back to Sanchez' house in handcuffs; rather, she followed some distance behind Sanchez and was walking normally.

Defendant also contends that the activities of Forest Heinz on the evening of February 3 create questions. He alleges that Peters changed his story several times in order to protect Heinz. At his subsequent sentencing hearing, Peters admitted that he lied at Sanchez' trial to help the State. In addition, the defendant points to the testimony of the witnesses who tentatively placed him in a saloon in Wisconsin at 8:30 on February 3. If he was there, he could not have been with Peters in Gurnee as Peters testified. Moreover, the defendant asserts that the activities of Rene Valentine create doubts as to his credibility. His behavior fits the pattern employed by persons selling drugs at D. Laney's. He was also carrying an unusually large amount of cash for a person who was unemployed. Finally, the defendant challenges the scientific evidence. He notes that fiber and hair comparisons can never be conclusive and also points out that Peters' description of Thompson's involuntary defecation was belied by the absence of fecal matter on her body or on the basement floor.

The thrust of defendant's sufficiency argument is that his convictions rested in large part on Peters' testimony, and that the totality of the evidence creates so many inconsistencies in Peters' story that the resulting conviction cannot stand.

The scope of our review of the sufficiency of the evidence to support a conviction is limited by principles which are by now well established. A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) In assessing suffi-

ciency, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) The relevant inquiry is "whether, after [re]viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261.

With regard to Peters' testimony in particular, we have acknowledged that the testimony of an accomplice is to be viewed with suspicion (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Baynes* (1981), 88 Ill. 2d 225, 232), but we have repeatedly held that it may be sufficient to sustain a conviction if it satisfies the jury of guilt beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Farnsley* (1973), 53 Ill. 2d 537, 544-45.) It is the role of the fact finder to weigh all the evidence. That role is preserved by the "legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261.

Applying these principles, we conclude that there is sufficient evidence to support the jury's verdict. Whatever conflicts may have existed in the evidence, resolution of such inconsistencies is wholly within the province of the jury. (*People v. Collins* (1985), 106 Ill. 2d 237, 262; *People v. Kubat* (1983), 94 Ill. 2d 437, 468.) Moreover, the jury is also entrusted with determinations of credibility. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62; *People v. Ellis* (1978), 74 Ill. 2d 489, 496.) Here, the jury was fully aware of the circumstances underlying

Peters' testimony, and the question of his believability was fully and capably argued by counsel. The jury chose to believe Peters, and we are not prepared to say that its conclusion was unsupported or unreasonable.

Defendant's next contention, related somewhat to the sufficiency issue, is that the trial court's refusal to reset Sanchez' trial to a date after Peters' sentencing hearing was prejudicial and a denial of due process. Defendant argues that Peters' was led (or at least permitted) to believe that he might be facing the death penalty. He would thus perceive the benefit to himself from cooperating in the case against Sanchez. He was thereby induced to testify more favorably to the prosecution than would otherwise be the case. He goes on to argue that the request for a continuance was reasonable and would not have prejudiced the prosecution's case.

The general rule is that the decision whether to grant a continuance is within the discretion of the trial court. (Ill. Rev. Stat. 1985, ch. 38, par. 114—4(e); *People v. Williams* (1982), 92 Ill. 2d 109, 116.) Neither of the parties has cited any case in which the issue here presented has been considered. Defendant cites a Federal *habeas corpus* decision, *Linton v. Perini* (6th Cir. 1981), 656 F.2d 207, in which the denial of a continuance was held to amount to a due process violation. However, in that case the denial unreasonably interfered with the defendant's right to effective assistance of counsel.

In contrast, the denial in the instant case does not implicate a specific constitutional guarantee. We also are not persuaded that the defendant was prejudiced in any other way by the denial. The jury was fully apprised of Peters' circumstances and the interest he had in testifying. Peters' conviction and pending sentencing were brought out in both direct examination and cross-examination. Also, defense counsel vigorously stressed the point to the jury in closing argument. Thus, the jury

was able to view Peters' testimony in the proper light and give it whatever weight and credence it thought it deserved.

The defendant's next contention is that he was denied a fair trial because the extensive pretrial publicity made it impossible to obtain an impartial jury. The defendant's motion to transfer venue or to bring in a jury from another county was denied.

The question of when pretrial publicity has reached a point which precludes obtaining an impartial local jury is a most vexing issue. This court has observed that "[c]rimes, especially heinous crimes, are of great public interest and are extensively reported. It is unreasonable to expect that individuals of average intelligence and at least average interest in their community would not have heard of any of the cases which they are called upon to judge in court. Total ignorance of the case is exceptional, and it is not required." (*People v. Taylor* (1984), 101 Ill. 2d 377, 386; *Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.) It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (*Irvin v. Dowd* (1961), 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.) In assessing a claim of partiality due to pretrial publicity, a reviewing court has an obligation to evaluate the *voir dire* testimony of the jurors (366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643; *People v. Taylor* (1984), 101 Ill. 2d 377, 390), and to review the entire record to determine independently whether the defendant received a fair trial (101 Ill. 2d 377, 391).

Based upon such a review, we conclude that the level of awareness of the case on the part of the venire and the jury ultimately selected was not so great as to establish partiality and to deny the defendant a fair trial. We are guided in our determination by *People v. Taylor*

(1984), 101 Ill. 2d 377.

In *Taylor*, the defendant was granted a new trial because of extensive, prejudicial pretrial publicity. The manager of a Peoria radio station described the case as the most widely publicized case he had seen in Peoria. (*People v. Taylor* (1984), 101 Ill. 2d 377, 383.) The defendant conducted a survey which revealed that of 382 voters questioned, 378, or 98.9%, had heard of the case. Moreover, 72% of those polled thought the police had arrested the right person.

The problems presented by the sheer *amount* of publicity were compounded by the nature of what was reported. Much attention had been devoted to the fact that a codefendant had been released after taking a polygraph examination, while the defendant's polygraph test was "inconclusive." (*People v. Taylor* (1984), 101 Ill. 2d 377, 383.) Such information would of course be inadmissible at trial. Despite exhaustion of all the defendant's peremptory challenges, six of the 12 jurors eventually impaneled had knowledge of the codefendant's release. 101 Ill. 2d 377, 391.

The defendant argues that, as in *Taylor*, the pool of persons from which his jury was drawn was exposed to extensive publicity regarding inadmissible, prejudicial matters. The media coverage of his case included reference to the Wisconsin murder of Sharon Egerer, and evidence of that offense could not be admitted in the prosecution's case in chief of the guilt phase of the trial. We are not persuaded, however, that the publicity rose to the extraordinary level that existed in *Taylor*.

As mentioned, the publicity in *Taylor* was described as "unprecedented" in intensity. While we accept that the coverage of the instant case was extensive, the record does not establish that it reached truly unprecedented proportions. As we stated in *Taylor*, the record must establish more than "the bare potential for bias."

(*People v. Taylor* (1984), 101 Ill. 2d 377, 395.) Also, we note that the defendant did not exhaust his peremptory challenges, but rather had three remaining at the close of jury selection. This factor, while not conclusive, tends to belie a claim of unfair prejudice. *People v. Madison* (1974), 56 Ill. 2d 476, 487.

The most basic fact distinguishing this case from *Taylor*, however, lies in a comparison of the juries that actually heard the evidence. In *Taylor*, fully half of the panel had detailed knowledge of the case, and were at least somewhat cognizant of inadmissible information. Here, the record indicates that only two of the eventual jurors had read of the crimes in the local newspaper, and neither had extensive recollection of what had been reported. Moreover, there was no indication that *any* of the jurors had an awareness of the Egerer slaying.

In sum, the review of the entire *voir dire* and record convinces us that the degree of publicity was typical for a case of this nature, and that awareness on the part of the venire was minimal and did not deny the defendant a fair trial.

The defendant next asserts that his jury was improperly biased in favor of the prosecution because of the exclusion of prospective jurors who expressed opposition to the possible imposition of the death penalty. He argues that so-called "*Witherspoon* excludables"—those jurors who admit to absolute scruples against the death penalty—should be allowed to participate in the guilt-innocence phase of a trial. Exclusion of such persons results in a jury which does not represent a fair cross-section of the community. Further, the defendant asserts that sociological studies have indicated that such "death-qualified" juries tend to be conviction prone, and thus deny defendants a fair trial.

Defendant relies primarily on *Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226, in which the arguments he ad-

vances were accepted. Defendant concedes that this court has rejected the *Grigsby* reasoning on a number of occasions (*e.g., People v. Collins* (1985), 106 Ill. 2d 237, 278-79; *People v. Caballero* (1984), 102 Ill. 2d 23, 44-45) but nonetheless urges us to reconsider our position.

We decline the defendant's invitation, for the simple reason that *Grigsby* has recently been reversed by the United States Supreme Court. (*Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758) The defendant has not presented, nor do we perceive independently, any State constitutional basis for departing from our prior cases and the now-consistent Supreme Court position on the issue.

Defendant's next contention is that he was denied a fair trial by certain tactics employed by the prosecution. Specifically, he complains that he was led to believe that Forest Heinz would be called as a witness because Heinz was included on the State's list of potential witnesses pursuant to Rule 412 (87 Ill. 2d R. 412). In anticipation of Heinz' testimony, the defendant chose not to object to testimony of Peters regarding other crimes in which Heinz and Sanchez allegedly participated. The State ultimately decided not to call Heinz. The defendant argues that he was "maneuvered" into permitting otherwise objectionable testimony to go before the jury and was then unable to counteract this testimony by cross-examination of Heinz. A motion for mistrial on this point was denied.

The denial of the motion was correct, for we do not find that Sanchez was prejudiced by these events. Initially, we note that the purpose of Rule 412 is to " 'prevent surprise and afford an opportunity to combat false testimony.' " (*People v. Raby* (1968), 40 Ill. 2d 392, 401.) However, there is no requirement that every witness listed must be called by the State. If there were, trials would be unduly protracted, and testimony would often be needlessly cumulative. The decision regarding which

witnesses will actually be called is, and must be, a matter of trial strategy, subject to the up-to-the-minute assessments of counsel. Here, the prosecution apparently decided that Heinz' testimony would add little to their case and made the decision not to use it. Moreover, if Heinz' testimony was considered essential by the defendant, he, of course, was free to subpoena Heinz and to call him as a witness. Having failed to do so, the defendant is in no position to claim prejudice. See *People v. Nowak* (1970), 45 Ill. 2d 158, 168.

The defendant's next assertion is that certain photographic evidence was presented in a prejudicial manner. As part of the State's scientific evidence, the jury was shown highly magnified comparison photographs of microscopic fibers taken from the carpet in Sanchez' car and from the body of Thompson. The photographs were used in conjunction with expert testimony that the fibers were consistent. The defendant argues that the photographs amounted to two indistinguishable orange stripes that were presented in such a way as to cause the jury to give the comparison excessive weight. He characterizes the display as "posed," and thus unfairly prejudicial.

In support of his contentions, the defendant relies on two cases in which photographs were used to present evidence in an artificial manner. In *French v. City of Springfield* (1976), 65 Ill. 2d 74, the jury was permitted to view a film which recreated the plaintiff's version of an auto accident. The admission of the film was held to be error, because it tended to precondition the jury to accept plaintiff's version of the facts.

Similarly, in *People v. Crowe* (1945), 390 Ill. 294, the trial judge refused to admit photographs taken by the defendant sometime after the occurrence in question, which were intended to substantiate the defendant's testimony. In upholding the refusal to admit the photo-

graphs, this court stated that they were taken "not for the purpose of showing the physical facts as they actually existed at the time of the crime." 390 Ill. 294, 303.

*French* and *Crowe* are just not in point. As mentioned, the film in *French* was a recreation of events, produced and directed by the plaintiff. Likewise, the photographs in *Crowe* were also of an after-the-fact, posed nature. Neither of these exhibits even purported to depict any physical facts as they actually existed at the time of the occurrence in question.

Here, in contrast, the photographs are of actual items of physical evidence obtained from the crime scene. While it is true that the fibers in the photographs have been magnified and presented to facilitate comparison, there is no suggestion that they have been misleadingly altered in any way. Without magnification, comparison would have been literally impossible, since the distinctive characteristics of such fibers are invisible to the unaided eye.

The defendant argues that the fiber expert chose only photographs which tended to show consistency between fibers, and thus caused the jury to overestimate the importance of the fiber comparisons. However, the expert testified in detail about fiber comparison. He acknowledged that such comparisons can at best lead to a conclusion that two fibers are consistent. The photographs were introduced to bolster his conclusion that *some* consistencies did in fact exist. He did not testify, nor did the photographs falsely suggest, that the fiber comparisons were identical and absolutely conclusive. In our view, the foundation surrounding the introduction of the photographs enabled the jury to properly consider their significance.

The next issue raised by the defendant, that the structure of the death penalty act places the burden of proof on the defendant and is therefore unconstitutional,

has previously been considered and rejected by this court. (*People v. Albanese* (1984), 104 Ill. 2d 504; *People v. Williams* (1983), 97 Ill. 2d 252; *People v. Brownell* (1980), 79 Ill. 2d 508.) As we stated in those cases, the sentencing determination calls for a weighing process in which neither party bears a burden of proof. As we have stated, "while the precise weight to be given each aggravating and mitigating factor is not made a matter of numerical calculation, that is not a constitutional infirmity." (*People v. Brownell* (1980), 79 Ill. 2d 508, 534.) We are not persuaded to abandon our prior position.

The defendant next objects that at the sentencing phase the trial judge erred in refusing to tender a proposed jury instruction which stated:

> "In considering the death penalty, you may, if you wish to do so, consider whether or not you wish to extend mercy to the defendant."

A similar argument was raised and rejected in *People v. Stewart* (1984), 104 Ill. 2d 463. There, the defendant sought an instruction at the death penalty stage which would have listed several nonstatutory mitigating factors. We upheld the trial judge's refusal to tender such an instruction on the basis that the jury was instructed that it could consider "any other facts or circumstances that provide reasons for imposing less than [the death penalty]," and the defense was permitted to present and argue any evidence he considered mitigating. Illinois Pattern Jury Instruction, Criminal, No. 7A.15(7) (2d ed. 1971) (IPI Criminal 2d); *People v. Stewart* (1984), 104 Ill. 2d 463, 492-93.

In our view this reasoning is equally applicable here. The defendant's non-IPI "mercy" instruction was refused, but the general "any other mitigating factor" instruction was given. Further, the defendant presented sympathetic testimony from members of his family, and counsel argued for mercy in his closing statement. Thus,

the jury was in a position to consider mercy, or any other mitigating factor, as it saw fit. No error resulted from refusal of the instruction.

The defendant's next contention raises a novel challenge to Illinois death penalty sentencing procedure. It is by now familiar that a sentencing hearing is conducted, at which the jury weighs the factors in aggravation and mitigation in order to arrive at an appropriate sentence. The pertinent statute provides as follows:

> "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(g).

The defendant argues that this statutory procedure does not contemplate jury *deliberation* in the traditional sense. Counsel proposed at trial, and argues here, that each juror be given a separate verdict form on which to indicate his or her decision on the death penalty. If any such juror votes against the death penalty, there is no unanimity and the death sentence is precluded. He argues that there is no reason to subject an antideath minority to the entreaties of the other jurors in order to arrive at a unanimous decision in favor of the death penalty.

We disagree, for the reason that the procedure urged by the defendant would be a drastic departure from classic concepts of jury functions. Had the legislature intended such a departure, we believe the language of the statute would have made that intention clear. Section 9—1 provides that the sentencing proceeding shall be held "before a *jury*," and that the *jury* must make a unanimous determination of whether mitigating factors exist. While the term "jury" is not defined in the Criminal Code of 1961, its meaning as a collective term is plain. Had the legislature not intended for the jury to reach a decision *as a body*, it could have referred to the

decision making entity as "jurors."

The Supreme Court has stated:

"[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. \*\*\* [T]he number should probably be large enough to promote group deliberation \*\*\*." (*Williams v. Florida* (1970), 399 U.S. 78, 100, 26 L. Ed. 2d 446, 460, 90 S. Ct. 1893, 1906.)

We conclude that the use of the term "jury" in the death penalty sentencing statute carries with it all of that word's legal incidents, including the concept of "group deliberation." Any deviation from this traditional interpretation must come from the legislature.

The defendant next asserts that a new jury should have been impaneled for the sentencing hearing because defendant injured himself in a suicide attempt and was at that point unfit to proceed. His motion for continuance was denied. Defendant, however, failed to raise this claim in his post-trial motion, and we therefore find that the issue has been waived. (See *People v. Caballero* (1984), 102 Ill. 2d 23.) Apart from the waiver, our examination of the entire record leads us to conclude that the trial judge's decision to proceed with the original jury was not so prejudicial as to amount to plain error.

The defendant next raises a broad attack on the death penalty as disproportionate and as a violation of the privileges and immunities clause of the United States Constitution. (U.S. Const., art. IV, sec. 2.) This somewhat convoluted argument may be summarized as follows: The fourteenth amendment creates a national citizenship for all persons born in the United States. Such national citizenship carries with it certain incidents and rights which no State may infringe. As an example,

the defendant cites *Edwards v. California* (1941), 314 U.S. 160, 86 L. Ed. 119, 62 S. Ct. 164, which declared a constitutional right of interstate travel. From that premise, the defendant goes on to point out that not all States have chosen to impose the death penalty. Thus, he argues, a national citizen may face qualitatively different penalties for the same act, depending merely upon the varying policies of different States. Given the death penalty's unique gravity and finality, the defendant argues that national citizens should be subject to it, if at all, under one consistent rule. He concludes that the death penalty is therefore unconstitutionally disproportionate and violates the privileges and immunities of national citizenship.

We find this argument wholly unpersuasive. First, the defendant's reasoning suffers from certain logical flaws. He asserts that citizens of States which have not chosen to adopt the death penalty are "immune" from it, while citizens of death penalty States are not. This, of course, is an inaccurate statement of the law. It is axiomatic that the law which is to be applied to criminal offenses depends not on the State citizenship of the offender, but rather on the situs of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 1—5.) Thus, citizens of Wisconsin, a State which has no death penalty, are nonetheless subject to it if they commit a capital offense in Illinois or any other death penalty State. Therefore, no citizens are necessarily "immune" from the death penalty on the basis of where they reside.

This legal misstatement aside, however, we reject the defendant's theory for a more fundamental reason. His argument, reduced to its essentials, is that it is somehow improper for a capital offender in Illinois to face the death penalty, while the identical offense committed in Wisconsin would not warrant it. The death penalty is thus disproportionate, he argues, because not all States

have chosen to employ it. The untenability of this assertion is best illustrated by taking it to a logical extreme. Under this reasoning, the death penalty would remain unconstitutional as long as any single State declined to enact it.

In our view, this theory violates the principles of federalism and judicial restraint which underlay *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, the case in which capital punishment was upheld as constitutional. In that case, the court stated:

"[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. *** [A] heavy burden rests on those who would attack the judgment of the representatives of the people.

This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. *** The deference we owe to the decisions of the state legislatures under our federal system [citations] is enhanced where the specification of punishments is concerned, for 'these are peculiarly questions of legislative policy.' " 428 U.S. 153, 175-76, 49 L. Ed. 2d 859, 876, 96 S. Ct. 2909, 2926.

The above-quoted language from *Gregg* refers to a challenge based upon the eighth amendment ban on cruel and unusual punishment. We are of the opinion that these considerations apply with equal force to the defendant's theory.

*Gregg* holds that capital punishment is not *per se* unconstitutional. The delicate decision whether capital punishment is appropriate requires an assessment of the wide range of public attitudes on the subject. Such an assessment can only be carried out via the legislative process, for achievement of popular consensus on so sensitive an issue is precisely and properly the legislative role. This assessment of public attitudes may result, and

indeed has resulted, in different policies from one State to the next. The States should be free to make such decisions for themselves, according to the moral dictates of their citizens.

The defendant's theory would turn this reasoning on its head, by effectively holding that if *one* State decided *against* the death penalty, *no other* State could decide *in favor* of it. The reasoned judgment of a given State legislature, entitled to great deference under *Gregg*, would be preempted by the judgment of another State legislature. We hold that this all-or-none approach defies the *Gregg* rationale, and we decline to embrace it.

Defendant next asserts that his death sentence is disproportionate and excessive in light of his character and personal background. It has been stated previously that the determination whether a death sentence is proper in a particular case "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *People v. Free* (1983), 94 Ill. 2d 378, 428; *People v. Carlson* (1980), 79 Ill. 2d 564, 590.) The proportionality requirement is met if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances, including the potential for rehabilitation of the defendant. (*People v. Free* (1983), 94 Ill. 2d 378, 428-29; *People v. Carlson* (1980), 79 Ill. 2d 564, 587.) In light of our responsibilities in review of capital cases, we have not hesitated to vacate death sentences where improperly imposed. *People v. Walker* (1982), 91 Ill. 2d 502; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Carlson* (1980), 79 Ill. 2d 564.

Defendant relies primarily on one such case, *People*

*v. Carlson* (1980), 79 Ill. 2d 564, in which this court vacated a death sentence and remanded for imposition of a lesser penalty. In *Carlson*, the defendant killed his ex-wife and a police officer, and had burned the ex-wife's home. The defendant and his ex-wife had planned to remarry, but she cancelled those plans and became engaged to another man. The crimes occurred after she broke the news to the defendant. Other evidence showed that, prior to his arrest, the defendant left a sum of money with a friend with instructions that it be given to his daughter for his son's use. We stated in *Carlson* that "[t]hese mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society." (*People v. Carlson* (1980), 79 Ill. 2d 564, 590.) We characterized the defendant as "an individual with no past criminal record who would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events." *People v. Carlson* (1980), 79 Ill. 2d 564, 590.

*Carlson* is not helpful. We are of the opinion that imposition of the death penalty was not unwarranted in this case. In mitigation, it was established that this defendant had no record of criminal convictions, had a stable work record and had treated his family members well. While these factors are relevant to the sentencing determination, their existence does not necessarily preclude imposition of the death penalty. *People v. Brownell* (1980), 79 Ill. 2d 508, 537.

In our view, the factors in aggravation are of sufficient gravity to more than outweigh these positive attributes. While it is true that defendant's record contains no criminal convictions, considerable evidence was adduced to indicate a history of criminal conduct. Most notable, of course, was evidence of the brutal killing of Sharon Egerer in Wisconsin. While defendant maintains his in-

nocence, we find the testimony against him, in particular that of Suzi Holton Eckerle, to be reliable and very damaging.

Also, unlike in *Carlson*, the crime here was in no way triggered by any independent provocation. Although once again the defendant denies involvement, the evidence established that the crimes were deliberate and cold blooded. To be convinced of defendant's guilt is also to be convinced of the ruthless manner in which he acted. In sum, we find no basis upon which to vacate the death sentence imposed by the jury.

The defendant's next contention, that Illinois' death penalty procedure is unconstitutional because it vests discretion to seek the death penalty in the prosecutor, has been repeatedly rejected. (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531; *People v. Kubat* (1983), 94 Ill. 2d 437.) We are not persuaded to alter our position on this issue.

The defendant next raises two related arguments regarding the admission of evidence of the Egerer murder at his sentencing hearing. He first contends that evidence of the other crime, for which charges were pending in Wisconsin, should not have been admitted at all or, alternatively, that the other crime should have been proved beyond a reasonable doubt in order to be considered in aggravation.

With regard to defendant's first point, we have repeatedly held that a jury in the second phase of a sentencing hearing may consider any evidence which is reliable and relevant. (*People v. Collins* (1985), 106 Ill. 2d 237, 282; *People v. Silagy* (1984), 101 Ill. 2d 147, 174.) This includes evidence of crimes with which the defendant has been charged but not convicted. (*People v. Collins* (1985), 106 Ill. 2d 237, 282.) Insofar as the sentencing process is intended to be a wide-ranging inquiry into every identifiable factor which tends to aggravate or

mitigate the offense, the formal rules of evidence do not apply. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 494-95; *People v. Adkins* (1968), 41 Ill. 2d 297, 300-01.) For the sentencing jury to close its eyes to otherwise reliable, highly relevant evidence would defeat these purposes.

Defendant also asserts, somewhat obliquely, that consideration of charged but convictionless crimes amounts to multiple punishment for the same offense. He cites *Jeffers v. United States* (1977), 432 U.S. 137, 53 L. Ed. 2d 168, 97 S. Ct. 2207, in support of this assertion. *Jeffers*, however, is a fairly basic double jeopardy case, and has nothing whatsoever to do with the admissibility of other-crimes evidence at sentencing proceedings. We thus find *Jeffers* wholly inapposite.

In our view, admission of criminal *charges* at sentencing is no more a double jeopardy violation than admission of criminal *convictions*. The admissibility of convictions has been repeatedly upheld. (*E.g., People v. Adkins* (1968), 41 Ill. 2d 297.) Likewise, we reject the defendant's assertion that the Wisconsin crime should have been proved beyond a reasonable doubt. We have reiterated that the only requirement for admissibility is that the evidence be reliable and relevant. (*People v. Free* (1983), 94 Ill. 2d 378, 422; *People v. La Pointe* (1981), 88 Ill. 2d 482, 497.) We find that the testimony relating to the Wisconsin crime clearly meets this standard.

The defendant also objects to certain questions posed to several witnesses on direct examination and cross-examination. Specifically, he claims that some questions enabled otherwise inadmissible evidence to go before the jury, and that the cross-examination of the defendant at the sentencing hearing was prejudicial.

During the direct examination and cross-examination of the FBI fiber expert, it was established that fiber comparison is an inexact science, and that at best it

could be established that two hairs or fibers were "consistent." The trial court had previously ruled that the expert could not testify as to his ultimate conclusion based upon the number of associations. That conclusion was to be left for the jury.

In spite of this prior ruling, the prosecutor, on redirect examination, asked the witness for his overall opinion. While this question was in direct disregard of the court's earlier ruling, and we thus disapprove of the prosecutor's conduct in this respect, we do not believe that error resulted for a very basic reason: An objection was interposed before the question was even finished, and the objection was immediately sustained. The court stated that the probative value of the fiber comparisons was a jury issue. We find that the court's action was proper and prevented any error from resulting.

The defendant also asserts that certain lines of questions asked of him on cross-examination went beyond the bounds of permissibility. For example, the defendant was asked to explain "how fibers from [his] sleeping bag could have gotten in Michelle Thompson's hair?" Counsel objected that the fibers had not been identified positively, but the objection was overruled. Defendant now claims that such questions contained "false insinuations," comparable to those asked in *People v. Nuccio* (1969), 43 Ill. 2d 375, where such questions were grounds for reversal.

We find *Nuccio* distinguishable. In that case, the defendant was asked questions which implied involvement in misconduct which was completely unsubstantiated. The prosecution then failed to present rebuttal witnesses to support these insinuations. Here, the questions related to fiber evidence which, while not 100% conclusive, was nonetheless before the jury for its consideration. The questions did not involve matters which were wholly outside the evidence presented, as had been

the case in *Nuccio*.

The last example of alleged improper cross-examination admittedly gives us pause. Near the end of the defendant's cross-examination, he was shown pictures of Sharon Egerer and Michelle Thompson. Thereafter, the following exchange occurred:

"Q. Whoever killed her, whether it was Mr. William Garris or you, would you agree that she was butchered in a brutal, sadistic and cruel and inhuman fashion?

A. I could not tell you. I didn't see the body.

Q. Did you look at the pictures?

A. No. They never showed me no pictures.

Q. I'll show you a picture, Mr. Sanchez, Let me show you People's Exhibit 9, which has been previously identified, a photograph of a woman lying face down, her hands behind her and with cable around her neck and ask you to look at that for the first time and tell this jury if whoever killed her in your opinion killed that woman in a sadistic, brutal and inhumanly cruel manner?

A. Yes, that is what it looks like, I can't see. I just see the red.

Q. Do you see her hand tied behind her back?

A. Yes.

Q. Would you admit whoever might have killed Michelle Thompson, would you agree that she lived through unimaginable terror as she was dragged from that parking lot, kicking and screaming as the evidence indicated?

A. I would not know. I was not there. I don't know what happened.

Q. Well, you heard the testimony. What do you think, Mr. Sanchez. What do you think she lived through as she was dragged kicking and screaming?

A. Yes.

Q. And would you agree whoever killed her, the photograph of Michelle Thompson indicates she was beaten?

A. Yes.

Q. Savagely from head to toe?

A. Yes.

Q. Whoever did do it to her Mr. Sanchez, would you agree she was sodomized and her body ripped open?

MR. COLLINS: Objection. That is not the evidence.

BY MR. MARGOLIS:

Q. Would you agree, Mr. Sanchez—

MR. COLLINS: If your Honor, please, Mr. Margolis is using a colorful cross-examination. And at this point some of it is proper but it is going beyond the evidence in this case and he is doing it for the death penalty effect. I object to it.

MR. MARGOLIS: This is the proper time, Your Honor, to ask such questions of this witness.

MR. COLLINS: There is a proper time to ask questions that have something to do with the record and a body being ripped open is not proper.

MR. MARGOLIS: I will rephrase the question.

BY MR. MARGOLIS:

Q. Would you say, sir, that the way that Michelle Thompson was sodomized was ugly and brutal and despicable?

A. Yes.

Q. Tell the jury, sir, what mitigating factors would cause a jury to not oppose the death penalty on facts such as this?

MR. COLLINS: I object.

THE COURT: Sustained.

MR. COLLINS: If the court please, I would like to be heard on that question. If your Honor, please, there is no possibility that Mr. Margolis thought that last question was a proper question.

It is never the function of defendant to argue his own case. I would suggest that question is so grossly improper that I move for mistrial at this time.

THE COURT: Denied."

The defendant argues that such questioning crossed the line of tolerable prosecutorial zeal, that the questions were intended only to degrade the defendant rather than elicit factual matters, and that sustaining his objection was insufficient to cure the resulting preju-

dice. In particular, he contends that the final question left the jury with the impression that the defendant himself could think of no reason why he should live.

While we acknowledge that the prosecutor's conduct was possibly overzealous, our review of the entire record compels the conclusion that it did not rise to the level of reversible error. Generally, the latitude permitted on cross-examination is left to the sound discretion of the trial court. (*People v. Williams* (1977), 66 Ill. 2d 478.) A court of review will disturb the decisions of the trial court only if manifest prejudice has resulted. (*People v. Williams* (1977), 66 Ill. 2d 478.) We do not find that counsel's conduct here fits the pattern of prosecutorial conduct condemned in *People v. Adams* (1985), 109 Ill. 2d 102, *People v. Lyles* (1985), 106 Ill. 2d 373, or *People v. Brisbon* (1985), 106 Ill. 2d 342. More typically, we have permitted counsel considerable latitude in cross-examination and argument, finding error only in the most egregious cases.

Thus, our cases have established that the border between permissible and impermissible conduct is imprecise, and that the determination depends in part, at least, on the closeness of the case as established by the entire record. Where the question of guilt or innocence or, as here, the relative weight of factors in aggravation and mitigation is relatively clear cut, we are less inclined to hold that "absent the constitutionally forbidden [inquiry], honest, fair-minded jurors might very well have brought in" a different result. (*Chapman v. California* (1967), 386 U.S. 18, 25-26, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 829.) In this case, we view the aggravating factors as clearly sufficient to support the sentence the jury imposed. Also, much of the cross-examination was not objected to, and the objection that defendant did make was sustained. The objectionable question was thus left unanswered and amounted to no more than an

assertion by counsel such as might well have been urged in a final argument. We are not persuaded that the challenged prosecutorial conduct amounted to reversible error.

The defendant's next claims, that the trial court abused its discretion in permitting certain redirect examination at the sentencing hearing, and that the prosecutor's closing argument was improper, have been waived by the failure to include them in his post-trial motion. See *People v. Caballero* (1984), 102 Ill. 2d 23.

The defendant's final point is that the trial court erred in refusing to give a proposed non-IPI instruction to the effect that the death penalty determination should not be influenced by sympathy for the family of the victim. This instruction was necessary, he argues, because Michelle Thompson's mother testified and, in what was undoubtedly an emotional moment, broke down on the witness stand.

The decision whether to give a non-IPI instruction is a matter for the discretion of the trial court. (*People v. Goodson* (1985), 131 Ill. App. 3d 734; *People v. Mitchell* (1984), 129 Ill. App. 3d 189.) When an applicable IPI instruction exists, that instruction should be given rather than a non-IPI instruction. 87 Ill. 2d R. 451(a).

In this instance, the jury was given the pattern instruction on sympathy, which provides, "Neither sympathy nor prejudice should influence you." (IPI Criminal 2d No. 1.01(5).) Defendant contends that this pattern instruction refers only to sympathy or prejudice based upon race or nationality and was inadequate to negate improper feelings of sympathy for the victim. We do not agree. The instruction provides, in plain terms, that sympathy is not to influence the jury decision in any way. More specific references to sympathy engendered *for* a particular reason or *toward* a particular person would only highlight that issue in the jurors' minds. We

find no abuse of discretion in refusing to so instruct.

Having resolved the issues presented in the defendant's direct appeal, we now turn to his petition for relief under section 2—1401 (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401). His petition, including amendments, was dismissed by the trial court without an evidentiary hearing. We granted leave to consolidate the appeal of that decision with his direct appeal.

Following his conviction in the instant case, defendant was transferred to Milwaukee County jail in Wisconsin to await trial for the Sharon Egerer homicide. Sometime thereafter, defendant's counsel learned that Oscar Cartegena, another prisoner in the Milwaukee County jail, had information regarding the crimes that occurred at D. Laney's in February of 1984. An investigator employed by defendant's counsel interviewed Cartegena.

Cartegena stated to the investigator that he had previously met Michelle Thompson and that she had phoned and asked him to meet her at D. Laney's on February 3, 1984. He went there, arriving at about 11:45, and waited in the parking lot to meet Thompson. He observed her and a man whose description fit Rene Valentine go in and out of the bar several times. He also noticed a van and a car containing two black men parked near his car.

Sometime thereafter, several men got out of the van and pulled Valentine into it. One of the men from the car grabbed Thompson and dragged her to the van. A few moments later, she was taken from the van and into the car, which then drove off. She was totally nude at that point. The description of the driver of the car fit Warren Peters. A few moments later, Valentine emerged from the van and was shot by one of the men. Sanchez was not among the group of abductors seen by Cartegena.

The defendant's investigator prepared and signed an

affidavit of what he had been told, which was presented in support of defendant's motion to vacate his conviction pursuant to section 2—1401 of the Code of Civil Procedure. The motion was stricken on the basis that the affidavit was insufficient as containing bare hearsay.

Defendant later filed an amended motion which stated that Cartegena's attorney had let it be known that if Cartegena were called to testify in any proceeding he would invoke the fifth amendment. Defendant accordingly requested that the trial court order the State to confer immunity upon Cartegena. The trial court denied these motions and dismissed the petition without a hearing.

A petition under section 2—1401 must satisfy two elements to warrant relief. It must establish adequate grounds for such relief and must show that the petitioner was not negligent in failing to raise the ground at trial. (*People v. Jennings* (1971), 48 Ill. 2d 295.) However, the trial judge did not reach the merits of the defendant's petition, and hence did not apply these standards. As mentioned, the petition was dismissed without a hearing on the basis that the accompanying affidavit was insufficient. In our view, this summary disposition was inappropriate, and we remand for an evidentiary hearing on the petition.

As a general rule, a petition supported by an attorney's affidavit containing only hearsay is insufficient to warrant relief under section 2—1401. (*Windmon v. Banks* (1975), 31 Ill. App. 3d 870.) However, we decline to apply this rule inflexibly, especially in capital cases where procedural fairness and factual accuracy are of paramount importance.

We find support for this viewpoint in the rules governing affidavits in other contexts. Supreme Court Rule 191 governs affidavits in proceedings under sections 2—1005 (summary judgment), 2—619 (involuntary dismissal)

and 2—301(b) (special appearances) (Ill. Rev. Stat. 1985, ch. 110, pars. 2—1005, 2—619, 2—301(b)). Rule 191(a) provides that affidavits shall be made on the personal knowledge of the witness and shall show that the affiant, if sworn as a witness, could testify competently to the contents of the affidavit. This requirement would generally preclude hearsay affidavits. 87 Ill. 2d R. 191(a).

Rule 191(b) provides an exception to this general rule, however, in situations where "material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise." (87 Ill. 2d R. 191(b).) The rule goes on to provide that in such situations the court may "make any order that may be just," including granting or denying the underlying motion.

While Rule 191 does not explicitly include affidavits in support of petitions under section 2—1401, we believe the reasoning behind the Rule 191(b) exception is equally applicable in that setting. In this case, the investigator's affidavit states that "material facts" are known to Oscar Cartegena, but that an affidavit to that effect cannot be procured due to Cartegena's invocation of the fifth amendment. In our view, this showing is sufficient to warrant an evidentiary hearing on the petition, at which Cartegena can be examined. The fifth amendment protection was asserted not by the witness but by his attorney.

We realize that Cartegena may himself invoke the fifth amendment if called to testify. However, as with any such claim, the trial court must make a threshold determination whether the privilege is being legitimately invoked. The mere fact that a witness has made a blanket fifth amendment assertion is not the end of the inquiry. (See *Zicarelli v. New Jersey State Com. of Investigation* (1972), 406 U.S. 472, 32 L. Ed. 2d 234, 92 S.

Ct. 1670.) If the trial court determines that Cartegena's privilege claim is improper, the court can, of course, order him to testify.

Defendant also bases his claim for relief on the allegedly perjured testimony of Warren Peters. With regard to perjury as the basis for relief under section 2—1401, we have stated:

> "The mere allegation of perjury is not sufficient to authorize relief under [section 2—1401]; perjured testimony that warrants relief from a final judgment must be shown by clear and convincing evidence to have been not merely false, but to have been willfully and purposely given, and to have been material to the issue tried and not merely cumulative, and that it probably controlled the determination." *People v. Jennings* (1971), 48 Ill. 2d 295, 299; *People v. Lewis* (1961), 22 Ill. 2d 68, 71.

The defendant argues that perjury has been established by Peters' "recantation" at his own sentencing hearing, and that the charge of perjury is further substantiated by Cartegena's statement. He contends that at the very least the trial court should have granted an evidentiary hearing on these claims.

With regard to the alleged recantation, we have examined the transcript of Peters' sentencing hearing. The claim that Peters' "recanted" at that proceeding is an overstatement. Peters admitted at his sentencing hearing that he changed certain immaterial aspects of his testimony between his own trial and that of Sanchez, and that as to certain statements he had lied. However, Peters said nothing which even approaches retraction of his essential testimony—that Sanchez performed the criminal acts for which he was convicted. We note that in the course of his own trial, Sanchez' trial and his own sentencing hearing, Peters has been subjected to extensive cross-examination three separate times. Based upon our assessment of the record, Peters has never deviated

from his story in any significant sense, or to the extent that one can say that Sanchez was convicted through the use of perjured testimony. Those aspects which may have been changed cannot be said to have been relevant to the determination.

Although that aspect of the section 2—1401 motion relating to Peters' alleged perjury is not convincing, as indicated above, we hold that the court erred in not conducting an evidentiary hearing as to the allegations concerning the testimony of Cartegena. If the evidence produced at the evidentiary hearing is sufficient under accepted standards, the court may grant the relief prayed.

For the above reasons, the convictions and sentences of defendant in cause No. 61239 are upheld and the judgments of the circuit court of Lake County are affirmed in that case, but the execution of the sentence of death is stayed pending disposition of the petition under section 2—1401 by the circuit court of Lake County. The judgment of the circuit court of Lake County in cause No. 63683 is reversed, and the cause is remanded for further proceedings consistent with this opinion.

> 61239 — *Judgments affirmed;*
> *death sentence stayed.*
> 63683 — *Reversed and remanded,*
> *with directions.*

JUSTICE GOLDENHERSH, concurring in part and dissenting in part:

In discussing the issues presented in this appeal, the majority states: "The last example of alleged improper cross-examination admittedly gives us pause." (115 Ill. 2d at 279.) Indeed it should; it is the most flagrant example of improper, prejudicial cross-examination to come before this court in the many cases involving death penalties.

Defendant correctly asserts that these questions were not designed to elicit facts but were intended to, and did, degrade the defendant in the eyes of the jury, to his prejudice.

The integrity of the judicial process requires that this type of interrogation be prohibited and that a judgment resulting from such tactics be reversed. The belated sustaining of an objection to the questions falls far short of removing the prejudice which it created.

I agree with the majority that the misconduct here does not fit the pattern of that found in *People v. Adams* (1985), 109 Ill. 2d 102, *People v. Lyles* (1985), 106 Ill. 2d 373, or *People v. Brisbon* (1985), 106 Ill. 2d 342; it was much more egregious. In those cases the prosecutor had some basis, however tenuous, for his position; here there is no justification for the type of cross-examination shown in this record.

Although I agree with the majority that the conviction for murder must be affirmed, I am of the opinion that defendant did not receive a fair hearing. I would vacate the death penalty and remand the cause for a new sentencing hearing.

CLARK, C.J., and SIMON, J., join in this partial concurrence and partial dissent.

JUSTICE SIMON, also concurring in part and dissenting in part:

I agree that the conviction should be affirmed and that the petition under section 2—1401 of the Code of Civil Procedure should be remanded for an evidentiary hearing. I part company with the majority, though, on its treatment of the cross-examination of the defendant at the sentencing hearing. While that cross-examination only "gives *** pause" to the majority (115 Ill. 2d at 279), it convinces me that the defendant did not receive

a fair penalty hearing.

As is aptly demonstrated in the passage quoted by the majority, the prosecutor attempted (with some success) to force the defendant to agree that the crimes—whoever committed them—were "brutal," "savage," and "sadistic," that Sharon Egerer had been "butchered," and that Michelle Thompson's body had been "ripped open." These questions were purely argumentative: by asking them the prosecutor sought not to establish any relevant facts, but only to invoke the witness' assent to the prosecutor's characterization of the facts. (E. Cleary and M. Graham, Illinois Evidence sec. 611.23, at 417 (4th ed. 1984).) The repeated use of inflammatory language in these questions aggravated the unfairness. Facts concerning the brutality of the killings were already before the jury and were plainly relevant to the character of the offender and the circumstances of the offense. But the barrage of emotionally charged questions pertaining to the defendant's *opinion* of the nature of killings which he denied committing—and one of which he had not been proved guilty of committing—was designed only to "harass" and "humiliate" the witness (*People v. Lyles* (1985), 106 Ill. 2d 373, 402) and thereby to increase the likelihood that the jury would return a verdict of death.

Equally outrageous was the final question in which the prosecutor asked for the defendant's thoughts as to what type of mitigation could cause the jury not to impose the death penalty on such facts. That question either called for a legal judgment which the defendant was unqualified to make or sought to force the defendant to make his own closing argument while on the witness stand. It also suggested to the jury that the burden of proving the inappropriateness of the death penalty rested on the defendant personally. The majority contends that because counsel's objection to this question

was sustained, the unanswered question "amounted to no more than an assertion by counsel such as might well have been urged in a final argument." (115 Ill. 2d at 281-82.) The point is that this was *not* closing argument, but a question put to the defendant on the witness stand at the end of a lengthy and improper line of cross-examination. That the question was never answered may have left the jury believing that the defendant could conceive of no reason why he should be spared. The only effect of this line of questioning was to unfairly prejudice the defendant and thus to distract the jury from its proper task.

In case after case involving the death penalty, this court has been confronted with blatant abuses of the prosecutorial function. (See, *e.g.*, *People v. Brisbon* (1985), 106 Ill. 2d 342; *People v. Lyles* (1985), 106 Ill. 2d 373; *People v. Holman* (1984), 103 Ill. 2d 133; *People v. Ramirez* (1983), 98 Ill. 2d 439.) A death penalty trial is neither a war nor a circus, and while emotions may run high, it is absolutely essential if law is to prevail that a decision of this gravity be made in a reasoned fashion. Overreaching by prosecutors intent on securing a verdict of death makes this impossible. The majority's characterization of the conduct in this case as "possibly overzealous" (115 Ill. 2d at 281) but not reversible error will simply encourage prosecutors to continue treading close to, and over, the line of proper behavior. The majority regards this "border *** [as] imprecise" (115 Ill. 2d at 281), but the very imprecision which the court has tolerated will inevitably result in an expansion of the boundaries of acceptable prosecutorial "zeal" as, in future cases, prosecutors encouraged by decisions such as this one, will push even further in harassing and prejudicing defendants by improper conduct. As a consequence, the overall fairness of capital trials will continue to erode. A stable and clearly drawn line is needed, and

I would indelibly stamp the tactics employed here as unconstitutional.

The error here was not only egregious, but should result in a new penalty hearing. The majority apparently holds that since "the relative weight of factors in aggravation and mitigation is relatively clear cut" (115 Ill. 2d at 281), the error was harmless.

The idea that this type of prosecutorial misconduct can be harmless or not reversible error in a sentencing hearing arises from a fundamental misunderstanding of the nature of the sentencing decision. Error at *trial* may be harmless if the evidence of the defendant's guilt is so overwhelming that conviction was inevitable even in the absence of error. (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1302; *People v. Carlson* (1982), 92 Ill. 2d 440, 449.) Error at a sentencing hearing is an altogether different matter, however; there the jury is not asked to decide a question of fact, but must exercise its judgment in choosing among possible sanctions. Unlike a verdict of guilt or innocence which is properly an objective determination based solely on the evidence presented, any sentencing decision is a discretionary judgment in which many factors—some of them objective, but many subjective—play a role. The discretionary nature of sentencing is illustrated by the difficulty in achieving anything approaching uniformity in conventional sentences: one offender may receive five years for an offense while a similarly situated defendant sentenced by a different judge gets 10. With respect to capital trials, there is plainly neither any set of circumstances nor any body of law which mandates that a particular jury, or even a particular judge, must impose a death sentence. In view of the subjective factors which may influence the outcome, it is therefore inappropriate to speak of overwhelming evidence in support of the decision to impose the death

penalty or to suggest, as the majority does here, that the decision can be "relatively clear cut" (115 Ill. 2d at 281). This is particularly evident where a jury, which is not used for sentencing purposes in Illinois except in capital cases and which is not permitted to explain the reasons for its decision, imposes the death sentence. No matter how substantial the evidence in aggravation may be, inflammatory prosecutorial conduct may tip the balance and can never be dismissed as harmless error.

Even if the harmless-error rule could be applied in these circumstances, the majority has expanded it beyond recognition. The court views the "aggravating factors as *clearly sufficient* to support the sentence the jury imposed." (Emphasis added.) (115 Ill. 2d at 281) While I am not sure what is meant by "clearly sufficient," this appears to represent either a conclusion by the majority that there was substantial evidence in favor of the jury's decision or that it was not against the manifest weight of the evidence. Neither is the proper standard under which the harmlessness of an error is to be judged. Rather, the evidence must be so overwhelming that it is clear beyond a reasonable doubt that the error did not affect the decision. (*United States ex rel. Burke v. Greer* (7th Cir. 1985), 756 F.2d 1295, 1302.) On this standard, we obviously cannot conclude that the error in permitting emotional, badgering, and argumentative cross-examination of the defendant was harmless. Significant evidence in mitigation was presented, including evidence that the defendant had been abused as a child, that he had held a job for some 14 years, and that he had saved enough to build a house. The defendant had no criminal convictions, and he had treated his family well. It was up to the jury to decide whether the evidence in aggravation outweighed that presented in mitigation. The jury's consideration of this question was tainted, though, by the prejudicial cross-examination of

the defendant.

The admission of evidence concerning the killing of Sharon Egerer (not the murder for which the defendant was convicted) also poses a far more difficult problem than the majority seems willing to acknowledge. True, this court has held that the rules of evidence do not apply at the second stage of the penalty phase, and reliable other-crimes evidence may be admitted. I think, however, that the more serious the "other" offense, the more reliable such evidence should be. Otherwise the jury may sentence the defendant to death, perhaps not mainly because of the killing of which he has just been proved guilty beyond a reasonable doubt, but instead because of another killing of which there is simply some evidence. To protect the defendant against the jury giving undue weight to a murder which has not been established beyond a reasonable doubt, no evidence of another killing should be admitted absent a conviction for that offense. Although this could pose some difficulty in a case like this one in which the defendant has been accused of two independent killings which cannot be tried together, I see no reason why sentencing on the first conviction could not be stayed pending trial on the other offense when a defendant requests a delay for that purpose. While a new jury would have to be impaneled for sentencing (if the defendant requested a jury), that is but a small price to pay to ensure that such damning evidence be reliable.

CHIEF JUSTICE CLARK joins in this partial concurrence and partial dissent.