THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. B.R. MACKAY AND SONS, INC., Defendant-Appellant.

First District (3rd Division) No. 1—91—1971

Opinion filed September 29, 1993.—Rehearing denied May 12, 1994.

Rivkin, Radler & Kremer, of Chicago (Warren S. Radler, Jay V. Krafsur, and Cindy F. Wile, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield (Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, B.R. MacKay & Sons, Inc. (BRM), appeals an order of the circuit court of Cook County granting the State's section 2—1401 petition (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401) to vacate the July 26, 1983, court order dismissing BRM with prejudice. The main issue to be decided on appeal is whether the trial court erred in granting the State relief under section 2—1401. BRM also asserts that the trial court erred in (1) denying its motion that the trial judge recuse himself from hearing the section 2—1401 petition on the basis that he extensively participated in the original settlement negotiations; and (2) refusing to order the State to return to BRM the $90,000 it had loaned to Film Recovery Systems Corporation (FRS) for the cleanup. We affirm.

During the early 1980's at its plant in Elk Grove Village, Illinois, FRS extracted silver from scrap X-ray film. The film was shredded into small chips, placed in a cyanide solution, and processed through an electrolite machine. After the silver was extracted, it was sent to BRM in Utah for final refining. The remaining material, film chips with cyanide residue, was stored at FRS's plant and in trailers and warehouses that FRS leased from various trucking companies and retailers.

BRM, which was one of the original shareholders of FRS, refined the impure silver it purchased from FRS into pure silver ingots that were sold for use in the manufacture of silver-bearing chemicals. In

dispute is whether FRS's film chip processing was separate and independent from BRM's silver refining business.

On April 4, 1983, after the Illinois Attorney General's office received a complaint that trailers in Hodgkins, Illinois, were filled with film waste, the Illinois Environmental Protection Agency (IEPA) and the Attorney General's Environmental Control Division conducted a preliminary investigation. The investigation revealed that (1) FRS's plant had been closed after an employee, Stefan Golab, died in February 1983, apparently of cyanide poisoning; and (2) large amounts of cyanide-tainted film chips were being stored in trailers and warehouses in Illinois. Based on those findings, the State sued several defendants, including BRM, for violations of environmental statutes and regulations governing the handling of hazardous waste. BRM filed a special and limited appearance and a motion to dismiss based on the lack of jurisdiction.

The motion was supported by an affidavit by Michael MacKay, who was BRM's president. MacKay stated that BRM had no employees in Illinois, did not sell or distribute products or services in Illinois, did not engage in the business of processing scrap film in Illinois, and did not store film chips resulting from the process in Illinois. MacKay also stated that BRM provided the initial capital for FRS, was a customer and creditor of FRS, and maintained a mailing address and phone number in Illinois during January and February 1983.

For two days, the trial court and the various parties participated in *in camera* hearings. Subsequently, a court hearing was held on May 25, 1983, during which the Attorney General (AG) outlined a plan to detoxify the 16 million pounds of film chips at multiple sites. Under the supervision of several government agencies, PetroChem Services, Inc. (PetroChem), would reprocess and detoxify the chips in accordance with a structured schedule. PetroChem estimated that the process would cost $250,000 and take 20 to 25 days.

The proposed plan included the establishment of three trust funds, which the court would supervise. FRS would provide $180,000 to the first fund, and the trucking companies would pay $70,000 to the second fund. The third fund would consist of money earned from the sale of the detoxified film chips and would be used to reimburse the State for security costs, penalties, and other contingencies, including claims by other litigants.

Following the hearing, the trial court entered an agreed order, which outlined the agreement of several parties, not including BRM, to fund the proposed cleanup operation. Although BRM was not a party to that order, it loaned FRS $90,000 for FRS's share of the cleanup cost.

After many failed attempts and great expense, the cleanup was finally completed in April 1985. On April 10, 1985, the trial court entered an order that included a finding that the film chips had been rendered nontoxic.

On July 26, 1983, the trial court entered an order dismissing BRM with prejudice. According to the order, the Act "did not create a cause of action against a corporate officer or shareholder" and neither BRM nor Michael MacKay "has been involved in any of the alleged violations charged in this cause of action."

After BRM was dismissed, the State learned that BRM had sufficient contacts with Illinois to give the court jurisdiction. Thus, the State filed a section 2—1401 petition to vacate the July 26, 1983, dismissal order. Section 2—1401 provides a procedure for obtaining relief from final orders and judgments after 30 days from the date of entry. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401; *Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 220, 499 N.E.2d 1381.) The purpose of a section 2—1401 petition is to bring before the trial court facts not appearing in the record that, if known to the court at the time judgment was entered, would have prevented its rendition. (*Johnson v. Steiner* (1988), 179 Ill. App. 3d 556, 560, 534 N.E.2d 391.) It is intended to achieve a just and fair result and to avoid unjust, unfair or unconscionable circumstances. *In re Petition of the Village of Kildeer to Annex Certain Territory* (1988), 124 Ill. 2d 533, 542, 530 N.E.2d 491.

On October 24, 1983, the State filed a section 2—1401 petition seeking to vacate that portion of the July 26, 1983, order dismissing BRM. According to the stipulated testimony of assistant AG Joseph A. Drazeck, he received a telephone call on August 12, 1983, from A.D. Freeman, a New Orleans attorney who was representing a plaintiff in a Federal court case against BRM.

Freeman told Drazeck that contrary to its statements in the Illinois case, BRM had asserted in the Louisiana case that it had employees and was doing business in Illinois. The AG's office received copies of the Louisiana documents on August 18, 1983. During September 1983, the AG obtained documents from FRS, Metallic Marketing Systems (MMS), and the Cook County State's Attorney indicating that several interrelated companies with various names conducted business out of FRS's Elk Grove Village property. Based on that information, the State filed its section 2—1401 petition. In response, BRM filed a motion to dismiss.

In December 1985, the trial court denied BRM's motion to dismiss the State's section 2—1401 petition. In March 1989, the State moved to set a hearing date. Before the hearing, BRM moved for the trial

judge's recusal, claiming that his involvement in the settlement negotiations leading to the May 25, 1983, agreed order, including *in camera* discussions, disqualified him from presiding over the hearing. The motion was denied.

Subsequently, a four-day hearing began on April 3, 1990. Following the hearing, the trial court found that the State had established by clear and convincing evidence that parts of BRM's affidavit were false. The court concluded that the evidence showed that BRM was an active participant with FRS in the cyanide silver extraction process at FRS's Elk Grove Village, Illinois, facility from 1980 through 1983. Thus, the court ruled that the State was entitled to relief under section 2—1401 and ordered that BRM be renamed as a defendant in the case.

BRM filed a motion for reconsideration on both the decision to grant relief under section 2—1402 and the decision to deny the recusal motion. Alternatively BRM requested reimbursement for the $90,000 it had lent to FRS for the cleanup. The motion was denied.

The main issue presented is whether the trial court abused its discretion in granting the State relief under section 2—1401. BRM's first argument is that it was dismissed on July 26, 1983, on the basis of the parties' settlement agreement, not on Michael MacKay's affidavit. BRM contends that if the cleanup plan had proceeded as the State had proposed instead of PetroChem spending the settlement money without cleaning up the chips, the State would not be trying to bring it back into the lawsuit to be a scapegoat to fund its continuing cleanup attempts.

At the section 2—1401 hearing, Morton Denlow, BRM's attorney during the 1983 settlement negotiations, testified that the State wanted BRM to lend $90,000 to FRS to help fund the $250,000 settlement. In exchange, the State agreed that BRM would be dismissed with prejudice on the merits when PetroChem completed its cleanup a few weeks later. Further, Denlow stated that the State agreed not to pursue BRM for any further problems relating to the known tainted chips, even if the cleanup work failed or additional funds were needed.

In response, the State asserts that the July 26, 1983, dismissal was based on BRM's motion to dismiss for lack of jurisdiction, not on the earlier settlement agreement, which was not mentioned in the court order. Furthermore, the State sets forth assistant AG Murdock's affidavit, which states that he advised Denlow that any agreement to dismiss BRM was premised on the veracity of MacKay's affidavit. According to Murdock's affidavit, he also told Denlow that the State would seek to vacate the dismissal order if MacKay's

statements were false. Denlow denied that Murdock ever told him that the dismissal was based on the veracity of MacKay's affidavit.

We find that the dismissal order was based on BRM's motion to dismiss with supporting affidavit, not on the settlement agreement to which BRM was not even a party. Even though there were discussions between the attorneys for the State and BRM regarding BRM's dismissal, BRM was dismissed due to the court's lack of jurisdiction. There may have been an informal agreement between the attorneys, but there was no formal agreement linking BRM's dismissal with its loan to FRS.

To prevail on a section 2—1401 petition, the petitioner must prove by a preponderance of the evidence: (1) the existence of a meritorious claim or defense; (2) due diligence in presenting the defense or claim to the trial court in the original action; and (3) due diligence in filing the section 2—1401 petition for relief. (*In re Kildeer*, 124 Ill. 2d at 544.) If the section 2—1401 petitioner seeks relief based on allegedly perjured testimony, it must prove by clear and convincing evidence that the testimony was false, willfully and purposely given, material, and probably controlled the determination. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 286, 503 N.E.2d 277.) In addition, the fraudulent concealment of evidence is a factor in determining due diligence in discovering and presenting the new evidence. (*In re Marriage of Travlos* (1991), 218 Ill. App. 3d 1030, 1037, 578 N.E.2d 1267.) A reviewing court will not disturb the trial court's ruling on a section 2—1401 petition absent a clear abuse of discretion. *Smith*, 114 Ill. 2d at 221.

BRM asserts that the State failed to show that the discovered evidence was actually new and would have prevented entry of the July 23, 1983, dismissal order. Moreover, BRM contends, the discovered evidence does not contradict, but was either duplicative of, or consistent with, MacKay's affidavit.

In his affidavit, MacKay delineated BRM's past involvement with FRS as a shareholder and customer and its present status as a creditor. BRM denied that it was ever in control of the film processing at FRS, that it ever engaged in such a process, that it knew the chips were tainted with cyanide, or that it stored or arranged for the storage of the tainted chips.

■ We reject BRM's argument. The State proved that a meritorious claim existed. The newly discovered evidence depicted a drastically different picture of BRM's involvement in the creation and storage of the cyanide-tainted film chips at the Elk Grove Village plant than the statements in MacKay's affidavit. If the trial court had considered the discovered evidence, it would not have dismissed BRM with prejudice.

Rather than simply being a past shareholder and customer and a current creditor with a one-time Illinois mailing address and telephone number, BRM was a direct and active participant in FRS's scrap film business. Not only was BRM instrumental in establishing FRS, but it also assumed a major role in the way it conducted its affairs.

The newly discovered evidence included the preincorporation agreement between MMS and BRM on December 1, 1979, which provided that BRM would pay FRS $275,000 for 17,500 shares of FRS common stock. In exchange, MMS would confidentially disclose its secret processes and know-how to Michael MacKay and Alvin Tolin.

In addition, BRM and Silver Recovery Systems (SRS) guaranteed FRS's lease at its Elk Grove Village property; FRS was BRM's exclusive agent in supplying silver extracted from scrap X-ray film; and BRM maintained a pool account for FRS, funded by the sale of silver, from which FRS drew funds as it purchased scrap film. As FRS's indebtedness grew, BRM became increasingly involved in FRS's business. In January and February 1983, BRM took over FRS's financial records, came to the Elk Grove Village plant to determine whether BRM would be able to dispose of the inventory, and sent personnel to FRS to help design a computer system to track FRS's inventory and customer sales. In December 1982, MacKay wrote to Steven O'Neill, FRS's president, that BRM intended to take over FRS's assets as partial liquidation for FRS's debt to BRM. Although it is unclear whether a takeover ever occurred, BRM did become integrally involved with FRS's activities.

According to MacKay's deposition in the Louisiana case, BRM established BRM Film Division, which existed in January and February 1983, to purchase scrap film that was delivered to the Elk Grove Village plant. FRS became BRM Film Division's purchasing agent and reported its sales to BRM, which then issued checks to the customers. These checks were drawn on BRM's Utah account and arrived in Illinois in BRM's envelopes.

In June 1980, BRM bought SRS, which was dissolved in January 1981. For seven months, SRS became BRM's marketing division and then lay dormant until BRM resurrected it to pay the operating expenses at FRS, including employee paychecks, in January and February 1983. FRS's accountant had blank SRS checks, which he was authorized to sign. In late February, Michael MacKay signed an Illinois business registration form on behalf of the dissolved SRS.

The Environmental Protection Agency shut FRS down on February 25, 1983, after an employee died apparently from cyanide poisoning. In March 1983, BRM Film Division and SRS ended all

activities at FRS. SRS checks were no longer used, and BRM no longer paid customer bills.

The following discrepancies existed between MacKay's affidavit and information later discovered:

1. The affidavit stated that BRM had maintained a mailing address and telephone number in Illinois, but omitted that the mailing address and telephone number were the same as FRS's Elk Grove Village plant or that BRM had set up BRM Film Division and SRS to purchase film and pay FRS's expenses.

2. The affidavit stated that "[a]t no time did [BRM] have any involvement in the decisions to store any of the film chips referred to in the complaint." Yet, since 1982, BRM was aware of the storage of vast quantities of film chips, which constituted a mounting expense for FRS.

3. The affidavit denied that BRM exercised "any control or in any way direct[ed] the operation of the film processing which took place at the premises of FRS" or that BRM "engaged in the business of processing scrap film for the recovery of silver in Illinois at any time." But, in January and February 1983, BRM and its two divisions, BRM Film Division and SRS, bought scrap film, monitored the purchases, and paid employee paychecks.

4. The affidavit stated that "*at no time*" (emphasis added) had BRM been engaged in the business of processing scrap film, in decisions to store scrap film, in the control or direction of FRS's film processing operations, or in the storage of film chips. It also denied knowledge that the chips contained cyanide residue. The evidence established, however, that BRM had purchased scrap film, monitored those sales, ordered laboratory tests on the film chips, knew that cyanide was used in the process, knew (at least since 1982) that storage cost amounted to approximately $360,000 per year, and put up $275,000 for stock in exchange for FRS's secret process.

MacKay's affidavit was carefully crafted to reveal only selected facts. While MacKay disclosed information concerning BRM's original purchase of FRS's stock, its former customer relationship, and its current creditor relationship to FRS, he did not even hint at the extent of BRM's two-year-long attempts to monitor and control FRS's expenses.

The evidence established BRM's involvement in the creation, transportation, and storage of the tainted film chips. If the trial court had been aware of BRM's close involvement in FRS's business, it would not have entered the dismissal order. In addition, the State proved by clear and convincing evidence that MacKay's affidavit was false, willfully and purposely given, material, and probably the basis

for the trial court's determination. Thus, we affirm the trial court's order vacating the July 26, 1983, dismissal order.

Next, BRM asserts that the State failed to act with due diligence prior to the entry of the July 26, 1983, order. BRM argues that the State had two months between the filing of the affidavit and the entry of the dismissal order. BRM contends that the affidavit alerted the State to BRM's contacts with Illinois.

The State proved due diligence before the order's entry. One factor to consider in deciding whether the State exercised due diligence is whether the failure to discover evidence is attributable to misrepresentations made by the opposing party. (*In re Travlos*, 218 Ill. App. 3d at 1037.) When an opponent suppresses information so as to prevent the inquirer from realizing what has occurred, the failure to discover the information is a result of the opponent's fault and not the inquirer's negligence. (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 285, 433 N.E.2d 253.) As earlier indicated, BRM fraudulently concealed information about its contacts with Illinois. Therefore, the State was not negligent in failing to discover the additional facts before the order's entry.

Next, BRM asserts that the State failed to prove that it exercised due diligence after the entry of the July 26, 1983, dismissal order. BRM maintains that the State could have filed its petition within 30 days of the entry of the dismissal order, which was August 25, 1983, because it was alerted to the new evidence on August 12, 1983, and received the documents on August 18, 1983. Instead, the State waited eight weeks to file a section 2—1401 petition with no explanation for its delay.

The State replies that it proved that it acted diligently in filing its petition once it discovered and verified the new evidence. The State maintains that it began to investigate the affidavit after Drazeck received the August 12, 1983, telephone call from attorney Freeman. After Freeman sent Drazeck the documents, which arrived on August 18, 1983, the State inspected them. The voluminous documents revealed dramatically new and intricate information about BRM's activities. They suggested that several companies, including BRM, SRS, and FRS, were interconnected, that they did business from several locations, and that at various times they conducted business from the Elk Grove Village address.

Given the volume and the nature of the materials and the need to analyze and investigate the facts they disclosed, the State maintains that the two-month period between the time the documents were received and the filing of the section 2—1401 petition was not excessive or unjustified. We agree.

Due diligence requires the State to have a reasonable excuse for failing to act within the appropriate time. (*Smith*, 114 Ill. 2d at 222.) The State must show that through no fault or negligence of its own, its meritorious claim was not presented in the trial court. (*Smith*, 114 Ill. 2d at 222.) To determine whether the State was negligent, the reviewing court may consider all the surrounding circumstances, including whether BRM had fraudulently concealed evidence. *In re Kildeer*, 124 Ill. 2d at 548; *In re Marriage of Travlos*, 218 Ill. App. 3d at 1037.

The State proved that it exercised due diligence after the order's entry. Although some information was obtained seven days before the 30 days expired, the State had to sift through an enormous amount of material and verify it. The phone call did not form a reasonable basis for a section 2—1401 petition. It would have been irresponsible to have filed a section 2—1401 petition without further investigation. That process reasonably took more than seven days to complete. Furthermore, as indicated earlier in this opinion, BRM fraudulently concealed material information about its contacts with Illinois, thus impeding the State's investigation.

■ Next, BRM asserts that the trial judge's refusal to recuse himself denied it a fair hearing on the section 2—1401 petition because the judge had been intimately involved in the three-day settlement discussions that occurred shortly after the case was filed. Furthermore, BRM contends, the trial judge should have recused himself to avoid any partiality or appearance of impropriety because he had a vested interest in seeing that the resolution, which he had fostered and for which he was publicly acclaimed, succeeded. We disagree.

BRM's argument is meritless because BRM was not denied a fair and impartial hearing before a fair and impartial judge. (*Easter House v. Department of Children & Family Services* (1990), 204 Ill. App. 3d 312, 315, 561 N.E.2d 1266.) While "[a] judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned *** where *** he has personal knowledge of disputed evidentiary facts concerning the proceeding" (134 Ill. 2d R. 63(C)(1)(a)), this case is not the type of situation where a reasonable person would question a judge's impartiality.

The trial judge properly denied BRM's recusal motion. BRM has not established a basis for its assertion that it was denied an impartial hearing as a result of the trial judge's intensive involvement with the negotiations or that a reasonable person, not knowing whether or not the judge is actually impartial, might reasonably question the judge's impartiality.

BRM was not a major player in the negotiations and was not a

party to the subsequent May 25, 1983, settlement order. BRM's attorney, who filed a special and limited appearance, stated that the main participants in the negotiations were the attorneys for FRS and the trucking companies. In light of BRM's limited role in the two days of intensive negotiations, there is an inference that any information that was exposed during the negotiations did not pertain to BRM or its position in the case. Furthermore, BRM's inference that the trial judge fingered it as a scapegoat is wholly unsubstantiated and unfounded. Thus, we affirm the court order denying BRM's motion for recusal.

■ Finally, BRM asserts that the State and the trial court unfairly deprived it of the $90,000 it loaned FRS to help pay for PetroChem's cleanup because the trial court's order to vacate the dismissal order judicially rescinded the agreement between the State and BRM.

The appeal in this case was premised on Supreme Court Rule 304(b)(3) (134 Ill. 2d R. 304(b)(3)), which permits an appeal from a judgment or order granting the relief prayed in a petition under section 2—1401 of the Code of Civil Procedure. The section 2—1401 motion requested that the July 26, 1983, order dismissing defendant be vacated and that BRM be reinstated as a defendant. The order entered in this case granted the relief requested. The request of BRM for the return of the $90,000 loan to FRS is not part of the order appealed from and therefore is not properly before us to decide.

Based on the foregoing, we affirm the circuit court judgment vacating the July 26, 1983, dismissal order.

Affirmed.

TULLY, P.J., and RIZZI, J., concur.