2022 IL App (2d) 210431-U
No. 2-20-0431
Order filed January 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 84-CF-188 |
| HECTOR REUBEN SANCHEZ, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Appointed counsel established that no nonfrivolous arguments could be raised on defendant's behalf; motion granted.

¶ 2    Defendant, Hector Reuben Sanchez, appeals the trial court's order denying him leave to file a successive postconviction petition. The trial court appointed the Office of the State Appellate Defender.

¶ 3    Per *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *People v. Lee*, 251 Ill. App. 3d 63 (1993), the appellate defender moves to withdraw as counsel. In her motion, counsel states that she read the record and found no issue of arguable merit. Counsel further states that she advised

defendant of her opinion. Counsel supports her motion with a memorandum of law providing a statement of facts, a list of potential issues, and arguments why those issues lack arguable merit. We advised defendant that he had 30 days to respond to the motion. That time has passed, and defendant has not responded.

¶ 4 In 1984, defendant was convicted of the murder (Ill. Rev. Stat. 1983, ch. 38, ¶ 9-1(a)(1), (a)(3)), aggravated kidnapping (*id.* ¶ 10-1(a)(1)), rape (*id.* ¶ 11-1(a)), and deviate sexual assault (*id.* ¶ 11-3(a)) of Michelle Thompson and the attempted murder (*id.* ¶¶ 8-4(a), 9-1(a)(1)) of Rene Valentine. He received a death sentence, later commuted to life imprisonment, for the murder and concurrent 60-year prison terms for the other offenses.

¶ 5 Briefly summarized, the evidence at trial was as follows. Valentine testified that, around 1:30 a.m. on February 4, 1984, as he and Thompson were leaving a Gurnee bar called D. Laney's, they were approached by two men, one black and one Hispanic. The black man took Thompson into a vehicle while the Hispanic man produced a gun. The Hispanic man took Valentine to a remote area of the parking lot and shot him twice. Valentine later identified that man as defendant.

¶ 6 Warren Peters Jr., "the black man in Valentine's narrative" (*People v. Sanchez*, 115 Ill. 2d 238, 252 (1986)) (*Sanchez I*) testified that he had been convicted of Thompson's murder and was awaiting sentencing. He identified defendant as his accomplice. Peters described how he and defendant took the handcuffed Thompson in Peters's car to defendant's house, where defendant raped her.

¶ 7 Thompson, half-naked, escaped at some point. Peters and defendant found her in the backyard of the house next door, and defendant dragged her back to his house. Defendant was concerned because she had been knocking on the door, so he returned to the neighbor's house.

When defendant came back to his house, he told Peters that he had explained the disturbance to the neighbor.

¶ 8 Defendant killed Thompson with a nylon strap and a coat hanger. Defendant and Peters drove defendant's car to Wisconsin where they disposed of the body.

¶ 9 Peters testified that he left his car in defendant's garage for several days. When it was returned, the formerly white top had been painted black.

¶ 10 Gene Gonyo, defendant's neighbor, testified that, around 1:30 a.m. on February 4, 1984, he was awakened by his dog barking. He parted his drapes and saw a man and a woman near his back door. The woman was nude from the waist down and referred to the man as " 'Larry,' " which Gonyo knew as defendant's nickname. The pair walked back toward defendant's house. Defendant later returned and apologized for the disturbance, explaining that the woman had a seizure or was on drugs. Gonyo was awakened again around 2:30 a.m. by his dog barking. This time, he saw defendant's car leaving his driveway with the headlights off. At the intersection of 21st Street and Delany Road, the car turned north on Delany toward Route 173.

¶ 11 Harold Deadman, an FBI microanalysis expert, compared hairs, fibers, and other material collected from Thompson's body, the crime scene, and other areas. He testified that fibers found on her body were consistent with sources in defendant's home and car. Thompson's hair was consistent with hair found in defendant's house and car, in Peters's car, and on Gonyo's property. Finally, buttons and fibers consistent with Thompson's clothing were found in defendant's house. Another FBI expert testified that the paint on Peters's car was consistent with paint found in defendant's garage.

¶ 12    On direct appeal to the supreme court, defendant raised several trial and sentencing issues, including that the evidence was insufficient. The court, having recounted the evidence at some length, found it sufficient. *Sanchez I*, 115 Ill. 2d at 261-62.

¶ 13    Defendant also filed a petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (Ill. Rev. Stat.1983, ch. 110, ¶ 2-1401). Defendant attached an affidavit from an investigator who interviewed a witness, Oscar Cartagena, who reported that he observed the shooting of Valentine and the kidnapping of Thompson in the parking lot of D. Laney's and that defendant was not present. The trial court dismissed the petition, and the supreme court affirmed. *People v. Sanchez*, 131 Ill. 2d 417 (1989) (*Sanchez II*).

¶ 14    In April 1990, defendant filed a postconviction petition raising numerous claims of ineffective assistance of counsel at both the guilt and sentencing phases. One such claim was that counsel was unprepared to cross-examine Deadman about his hair and fiber analysis. The trial court dismissed the petition, and the supreme court affirmed. *People v. Sanchez*, 169 Ill. 2d 472 (1996) (*Sanchez III*). The court concluded that, even if it was deficient, defense counsel's cross-examination of Deadman did not prejudice defendant, because the other evidence of his guilt was "overwhelming." *Id.* at 499.

¶ 15    Defendant filed a motion for DNA testing of material found on Thompson's body and at the crime scene. The trial court denied the motion, but we reversed and remanded for further proceedings. *People v. Sanchez*, 363 Ill. App. 3d 470, 471, 480 (2006) (*Sanchez* IV). On remand, the trial court granted the motion. However, an independent laboratory found no biological material that could be tested.

¶ 16    In March 2019, defendant, through appointed counsel, filed the pleading at issue in this appeal: a motion for leave to file a successive postconviction petition. Defendant attached a

proposed petition raising three main claims. First, the evidence of defendant's guilt was insufficient, as much of the testimony came from Peters, his alleged accomplice, who was awaiting sentencing for Thompson's murder. Second, recent scientific studies cast doubt on the accuracy of eyewitness identification testimony such as Valentine's. Third, much of the scientific evidence against defendant at trial had since been discredited in federal reports. The trial court denied the motion.

¶ 17    In her motion to withdraw, counsel submits that it would be frivolous to challenge the denial of defendant's motion for leave to file. We agree.

¶ 18    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy for criminal defendants who claim that substantial violations of their constitutional rights occurred at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act contemplates the filing of only one petition. *People v. Coleman*, 2013 IL 113307, ¶ 81. Illinois courts permit the filing of a successive postconviction petition only where fundamental fairness so requires. *Id.* There are two recognized instances. The first is where the defendant establishes "cause and prejudice" for failing to raise the claim earlier. *Id.* ¶ 82. Second, even without a showing of cause and prejudice, a defendant may bring a claim of actual innocence to prevent a miscarriage of justice. *Id.* ¶ 83.

¶ 19    To establish "cause," the defendant must show that some objective factor external to the defense impeded his ability to raise the claim in the initial postconviction proceeding. *Id.* ¶ 82; 725 ILCS 5/1-122(f) (West 2016). To establish "prejudice," the defendant must show that the claimed constitutional violation so infected his trial that the resulting conviction violated due process. *Coleman*, 2013 IL 113307, ¶ 82; 725 ILCS 5/122-1(f) (West 2016).

¶ 20    A proceeding under the Act is a collateral attack on a final judgment. *Edwards*, 2012 IL 111711, ¶ 21. Issues that were raised and decided on direct review are barred by the doctrine of *res judicata*, and issues that could have been presented on direct review, but were not, are procedurally defaulted. *People v. Young*, 2018 IL 122598, ¶ 16. Also, any claim that was not included in the original or an amended petition is forfeited. *Id.*; 725 ILCS 5/122-3 (West 2016). As noted, a forfeited claim may be raised in a successive postconviction petition if the defendant satisfies the cause-and-prejudice test. *Young,* 2018 IL 122598, ¶ 16; 725 ILCS 5/122-1(f) (West 2016).

¶ 21    The first claim in defendant's proposed petition is an attack on the sufficiency of the evidence. He argues that Peters was an accomplice who likely sought to curry favor with the prosecution on the eve of his sentencing hearing and that Gonyo never specifically identified Thompson as the woman he saw with defendant. We discuss separately below defendant's challenges to Valentine's identification and the scientific evidence. We note, however, that the sufficiency of the evidence to convict is not an appropriate subject for a postconviction proceeding, the function of which is not to redetermine the defendant's guilt or innocence. *People v. Greer*, 212 Ill. 2d 192, 203 (2004). In any event, as counsel notes, most of defendant's arguments were made in some form to the jury, which nevertheless convicted him. The supreme court held on direct appeal that the evidence was sufficient. *Sanchez I*, 115 Ill. 2d at 261-62. On appeal from the denial of defendant's initial postconviction petition, the supreme court went a step further and characterized the evidence as "overwhelming." *Sanchez III*, 169 Ill. 2d at 497, 499. Thus, we agree with counsel that any argument concerning the sufficiency of the evidence would be barred by *res judicata*. *Young*, 2018 IL 122598, ¶ 16.

¶ 22    Defendant's second claim is that new scientific developments have questioned the reliability of eyewitness identification. He contends that, had the jury been properly advised about the inherent weaknesses of such identifications, it might have rejected Valentine's testimony.

¶ 23    Defendant specifically references a 2014 report by the National Research Council of the National Academy of Sciences, Identifying the Culprit: Assessing Eyewitness Identification (2015), (2014 NRC report) "summarizing dozens of studies and years of research." Defendant also cites *People v. Lerma*, 2016 IL 118496, ¶ 32, in which the supreme court held that the trial court abused its discretion in denying the defendant's request to call expert witnesses on the reliability of eyewitness identification. The *Lerma* court recognized that previously, in *People v. Enis*, 139 Ill. 2d 264 (1990), it had expressed skepticism toward expert testimony on that subject. However, the court observed:

> "The decades since *Enis* *** have seen a dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted. *** The reason for this trend is that, although findings of the sort described in [the proposed expert witnesses'] reports are now 'widely accepted by scientists,' those same findings 'are largely unfamiliar to the average person, and, in fact, many of the findings are counterintuitive.' [Citation.] At the same time, advances in DNA testing have confirmed that 'eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined.' [Citation.] In other words, in the 25 years since *Enis,* we not only have seen that eyewitness identifications are not always as reliable as they appear, but we also have learned, from a scientific standpoint, why this is often the case." *Lerma*, 2016 IL 118496, ¶ 24.

¶ 24 Defendant contends that these recent developments establish cause for his failure to raise the issue in his initial postconviction petition. Counsel concludes however, that defendant cannot show cause as to this issue, and we agree. It is hardly novel to suggest that witnesses might not accurately describe what they observed, whether because of inattention, distorted memory, deliberate fabrication, or simply difficulties in describing. Nor is the scientific study of this phenomenon of only recent vintage. Indeed, the proposed petition refers to "[d]ecades of research" and cites a litany of studies dating back to 1982, before defendant's trial. Defendant acknowledged that the 2014 NRC report merely summarized earlier work.

¶ 25 We have rejected a similar argument that new scientific studies and the United States Supreme Court's decision in *Miller v. Alabama*, 576 U.S. 460 (2012), established "cause" for failing to raise earlier a claim that the defendant's young age when he committed the crime should have precluded a life sentence. We stated:

"Defendant's argument that there was cause for his failure to raise his proportionate-penalties claim in his first petition cannot be sustained on the basis that *Miller* had not yet been decided. *Miller*'s nonexistence did not prevent defendant from contending that the trial court's alleged failure to consider his youth as a factor in mitigation violated the proportionate-penalties clause. *Miller*'s nonexistence as of 2002 merely deprived defendant of some helpful support for that claim. Surely, defendant's contention that this created 'cause' proves too much. If the acquisition of new scientific knowledge to support an already viable claim were all that a defendant needed to show in order to raise the claim years late, then the 'cause' requirement of section 122-1(f) would be a weak threshold indeed. It is one thing to hold, as the Court did [in *Miller*], that a substantive rule of law applies retroactively to a case that has completed the direct-appeal process.

[Citation.] It is quite another to hold that everything written in support of that new rule also applies retroactively and thus requires reopening a judgment that did not even implicate the new rule." *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 9.

¶ 26 So too here. *Lerma* did not create a new constitutional rule as *Miller* did (*see* People v. Davis, 2014 IL 115595, ¶ 41). Indeed, the court acknowledged that, as early as 1990, it had at least grudgingly approved the use of expert witnesses on the subject of eyewitness identification. *Lerma*, 2016 IL 118496, ¶ 24; see also *People v. Guerrero*, 2012 IL 112020, ¶ 20 ("[T]he lack of precedent for a position differs from 'cause' for failing to raise an issue, and a defendant must raise the issue, even when the law is against him, in order to preserve it for review."). And despite defendant's attempts to characterize the 2014 NRC report as groundbreaking, he acknowledges that it merely summarizes earlier work. Thus, the later arrival of *Lerma* and the 2014 NRC report do not excuse defendant's failure to include the issue in his initial postconviction petition.

¶ 27 Counsel further argues that defendant cannot establish prejudice as to this issue, and we agree. Counsel notes that, at most, expert testimony on the subject of eyewitness identification might have provided the jury with a new perspective on Valentine's testimony. However, defendant proffered no evidence tending to prove that Valentine was mistaken in his identification of defendant.

¶ 28 The final main contention in the proposed petition is that recent United States Department of Justice (DOJ) reports discredit much of the scientific evidence. However, defendant attached only one report, which was dated 2013 and addressed Deadman's testimony about his hair comparison (2013 DOJ report). The 2013 DOJ report concluded that Deadman made "Inappropriate Statements" during his testimony. Deadman committed "Error Type 2" and "Error Type 3." "Error Type 2" was in "assign[ing] to the positive association a statistical weight or

probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that [could/would] lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association." His "Error Type 3" was in "cit[ing] the number of cases of hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual." Both assertions "exceed[ed] the limits of science." The DOJ noted, however, that it was taking "no position on the materiality of the error in this case."

¶ 29    Counsel concludes that, while the 2013 DOJ report arguably provides cause for defendant's failure to raise the issue in his initial postconviction petition, defendant cannot show prejudice on this issue. We agree.

¶ 30    First, the 2013 DOJ report suggests only that Deadman exaggerated the weight of the "positive association" he found; it does not question his methodology or suggest that the "positive association" itself was erroneous. Moreover, the scientific evidence was a relatively small part of the State's case against defendant. Three separate eyewitnesses connected him to the crime. Indeed, when defendant, in his initial postconviction petition, faulted defense counsel's cross-examination of Deadman, the supreme court found that defendant was not prejudiced by the error because the remaining evidence of his guilt was "overwhelming." *Sanchez III*, 169 Ill. 2d at 499. It is inconceivable that the evidence would be found any less overwhelming in this context.

¶ 31    As counsel notes, defendant also claimed to have reports repudiating the fiber and paint analysis, but defendant did not supply those reports. Thus, they do not merit consideration. See *People v. Blair*, 215 Ill. 2d 427, 453 (2005).

¶ 32    Finally, counsel argues that defendant has not made an arguable claim of actual innocence. "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* "Evidence is material if it is relevant and probative of the petitioner's innocence." *Id.* "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* Finally, evidence is conclusive if, together with the trial evidence, it "would probably lead to a different result." *Id.*

¶ 33    In addition to the 2014 NRC report and the 2013 DOJ report, defendant submitted two affidavits. First, he provided a 1990 affidavit from an investigator who claimed that Gonyo reported that "he could not provide a physical description of the person he observed in his yard." Gonyo said that he "did not see the person's hair color, face, or height, because he was looking through sheer curtains that restricted his view." Gonyo also told the investigator that "he could not tell what color clothing the person was wearing." Second, defendant provided the May 2016 affidavit of Travis Davis, defendant's nephew, who averred that he had been to Gonyo's home and that, from inside the home, "no one could reasonable [*sic*] tell the make, model, year, or color of any vehicle at [the] intersection [of 21st Street and Delany Road] at night."

¶ 34    The reports and the affidavits do not arguably support a claim of actual innocence. First, only the 2013 DOJ report can be considered newly discovered evidence. The 2014 NRC report is newly generated, but its content is, as noted, hardly novel. As for the affidavits, defendant, who had the burden to make a showing of actual innocence to obtain leave to file, did not assert that he could not have obtained the information earlier with reasonable diligence.

¶ 35    Moreover, the submissions do not constitute conclusive evidence of innocence. Nothing in them suggests that someone else committed the crime or that defendant is otherwise innocent. The 1990 affidavit purports to question Gonyo's ability to identify the hair color, color of clothing, or height of the "person" he saw outside his home, but the affidavit does not challenge his ability to ascertain the most damning details, namely that the person was a woman, half-naked, standing in the snow. Nor does the affidavit discredit Gonyo's testimony that defendant later came to Gonyo's house acknowledging that a woman had been on Gonyo's property and explaining that she was on drugs or had a seizure. The 2016 affidavit challenges Gonyo's ability to identify, at night, the details of a car in a nearby intersection, but this did not undercut Gonyo's testimony that he saw defendant pull away from his house about 2:30 a.m.

¶ 36    The 2013 DOJ report calls into question part of the scientific evidence, which itself was a relatively small portion of the evidence submitted. The 2014 NRC report merely suggests that, if the case were tried today, the jury might have received expert testimony on the reliability of Valentine's identification.

¶ 37    After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit. Thus, we grant the motion to withdraw, and we affirm the judgment of the circuit court of Lake County.

¶ 38    Affirmed.