NOTICE
Decision filed 07/30/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230538-U

NO. 5-23-0538

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 19-CF-469 |
| | ) | |
| MANTEZ D. DUNCAN, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in dismissing the defendant's section 2-1401 petition for relief from judgment, and since any argument to the contrary would lack arguable merit, the defendant's appointed appellate attorney is granted leave to withdraw as counsel, and the judgment dismissing the section 2-1401 petition is affirmed.

¶ 2    The defendant, Mantez D. Duncan, is serving a 55-year prison sentence for first degree murder. He appeals from the circuit court's order that dismissed his petition for relief from judgment. See 735 ILCS 5/2-1401 (West 2022). His appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal does not present any potentially meritorious issue for review. On that basis, OSAD has filed in this court a motion to withdraw as counsel, along with a memorandum in support of the motion. See *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *People v. Kuehner*, 2015 IL 117695. The defendant has filed a *pro se*

1

objection to OSAD's *Finley* motion. Having reviewed OSAD's motion and memorandum, the defendant's objection, and the entire record on appeal, this court agrees with OSAD's conclusion about this appeal. Therefore, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 3                                    BACKGROUND

¶ 4      The defendant was charged with two counts of first degree murder in the death of Clender "Junior" Edmond. Count I alleged intentional or knowing murder (720 ILCS 5/9-1(a)(1) (West 2018)) and count II alleged felony murder (*id.* § 9-1(a)(3)). Count I referred to the 25-years-to-life sentence enhancement for first degree murder, applicable where the defendant personally discharged a firearm that proximately caused another person's death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018).

¶ 5      The State filed four petitions that sought the circuit court's grant of use immunity from prosecution for four other persons who were implicated in the murder of Edmond—Blake Shahan, Krystal Scerba, Cardell Thomas, and Darleedria Flippen. In late-July 2020, the court granted all four individuals use immunity for their testimony at the defendant's trial, and the court compelled each individual to testify.

¶ 6      The defendant waived his right to a trial by jury. In mid-August 2020, the cause proceeded to bench trial. Here follows a summary of the trial evidence.

¶ 7                     *The Bench Trial, the Sentencing, and the Direct Appeal*

¶ 8      At the trial, Anthony Decker, a long-time detective with the Marion County Sheriff's Department, testified that on December 6, 2019, he and Ryan Castleman, a fellow detective, were called to the sheriff's office to interview a woman named Krystal Scerba. Scerba had been arrested for drugs, but she started talking about a recent murder. When Decker and Castleman arrived to

2

interview Scerba, she told them about the shooting of a man named Clender "Junior" Edmond at the Marion County home of Cardell Thomas.

¶ 9 After this interview with Scerba, but on that same day, Decker and Castleman attempted to corroborate statements made by Scerba. They interviewed witnesses Blake Shahan and Cardell Thomas. Shahan was interviewed at the Centralia police headquarters, and Thomas was interviewed at his house. During the at-home questioning of Thomas, Decker noticed "drops of blood" on a recliner. With Thomas's permission, Decker took swabs of that blood. With Thomas's permission, Decker also went to the attached garage of the home, but he did not notice anything unusual.

¶ 10 After the interview with Thomas on December 6, 2019, Decker tried to locate Clender "Junior" Edmond, without success. Decker spoke with someone who claimed to be in frequent contact with Edmond, and as a result of that conversation, Decker sent Detective Castleman to the Industrial Tavern, outside Centralia, in order to collect any surveillance video from that establishment.

¶ 11 Decker also arranged for a cadaver dog to search near Cardell Thomas's property. This dog search was conducted on December 12, 2019. Slightly more than 100 yards behind Thomas's house, a "burn pile" was found, and on one portion of the burn pile, human remains were found. "The body was severely burned," Decker testified, to the point where it could not be identified. Only the top half of the body was recovered, and most or all of its skin had been burned off. The remains of a blue tarpaulin were found with the human remains.

¶ 12 Decker further testified that as a result of the discovery of human remains, Cardell Thomas was taken into custody in this case on December 12, 2019, for further questioning. After the interrogation of Thomas, Blake Shahan was arrested in this case and was interviewed, also on

3

December 12. Also arrested on December 12 were the defendant and Darleedria Flippen. That evening, Darleedria Flippen was questioned. The next day, which was December 13, Krystal Scerba was arrested.

¶ 13    Photographs of Cardell Thomas's property show large lawns, with considerable distance between Thomas's residence and a neighboring residence. Woods were nearby. The house itself, however, was rather small. It featured a living room and a kitchen that were, essentially, one room. It had a very small laundry room. The laundry room had a door that opened onto two steps that led down to a spacious two-car garage. Opposite the laundry-room door were two sliding garage doors.

¶ 14    The State presented evidence, both testimony and surveillance video, of events during the night of December 2, 2019, and well into the early hours of December 3. Clender "Junior" Edmond, the victim here, was a customer at the Industrial Tavern, just outside Centralia, during the night of December 2. He had a substantial amount of cash at the time. At approximately 2:10 a.m. on December 3, Krystal Scerba and Blake Shahan walked into the Industrial Tavern. They socialized with Edmond. At approximately 4:20 a.m., the three of them—Scerba, Shahan, and Edmond—together left the Industrial Tavern. They entered a white sedan parked on the tavern's lot, and they drove off. Almost half-an-hour later, at approximately 4:47 a.m., a white sedan entered the parking lot of the Centralia Walmart. (A drive straight from the Industrial Tavern to the Centralia Walmart generally requires no more than 10 minutes.) Krystal Scerba got out of the front passenger seat and walked toward the Walmart. Inside, she purchased a few items. At approximately 5:09 a.m., she walked out of the store and returned to the white sedan. At 5:10 a.m., the car drove off the Walmart lot.

¶ 15    Krystal Scerba testified that she had been addicted to heroin and methamphetamine for years. She knew the defendant as "Tez." He was her heroin dealer at the time of the events in this

4

case. She barely knew Clender Edmond, who was called "Junior," though Edmond himself oftentimes suggested that he and Scerba should have sex. Scerba knew the defendant's live-in girlfriend, Darleedria Flippen, as "Bubbles." She had known Blake Shahan for 15 years and thought of him as a brother.

¶ 16    On December 3, 2019, in the wee hours of the morning, Scerba was with Shahan in his car, outside the Centralia apartment building where the defendant and "Bubbles" Flippen resided. Scerba was "high" at the time. The two were waiting for the defendant to come home. Before long, the defendant appeared. The defendant asked Scerba and Shahan to go to the Industrial Tavern and pick up Edmond. According to the defendant, Edmond had stolen money from him.

¶ 17    Scerba and Shahan went to the Industrial Tavern. On a few occasions, they left the tavern but soon returned. Eventually, they convinced Edmond to leave the tavern with them. Shahan drove; Scerba was in the front passenger seat, and Edmond was in the back. Scerba ingested heroin. Then, all three of them smoked "a blunt." Still in the car, Scerba talked Edmond into buying her a phone, and they proceeded to the Walmart store in Centralia. Edmond gave her money. Scerba, alone, left the car and went inside Walmart to buy a cell phone. As she bought the cell phone and exited the Walmart, Scerba did not know where she and Shahan would be taking Edmond. When she walked back to the car and spoke with Shahan, she learned that they were to go to the home of Cardell Thomas, "somewhere out on Green Street."

¶ 18    Scerba further testified that the three of them—Scerba, Shahan, and Edmond—arrived at Cardell Thomas's house, and they went inside the residence. Thomas was the only one there. Scerba walked to the bathroom to do drugs. When she came out of the bathroom, she saw Thomas get up and wrestle with Edmond. Thomas was upset with Edmond, Scerba thought, because he thought that Edmond had called him "a big N word." With Thomas and Edmond wrestling, Shahan

5

"got in the mix of it somehow." Scerba saw a gun fall on the floor, and she picked it up and placed it on a counter in the kitchen. "A bunch of money" fell from a black bag that Edmond had. Scerba picked up the money and the bag and placed them, too, on the counter in the kitchen. Thomas followed her into the kitchen and started to count the money. Feeling frustrated, Scerba returned to the bathroom, where she injected herself with heroin. After a few minutes, Scerba walked out of the bathroom for the second time. Edmond was seated on the couch in the living room; he was bleeding from his head and using his white T-shirt, which he had taken off, to stanch the bleeding.

¶ 19    Next, according to Scerba, the defendant and his girlfriend, "Bubbles" Flippen, arrived by car, and they walked into Cardell Thomas's house. The defendant and Flippen, both of whom wore black gloves, walked straight to Edmond and starting "swinging," hitting him repeatedly with their hands. The defendant said that Edmond was "bogus for taking their money." Edmond said that the money was in Flippen's mother's bedroom closet. (Edmond sometimes stayed at Flippen's mother's apartment.) The defendant sent Flippen to her mother's apartment to look in the closet for the money, and Flippen left Thomas's house. Meanwhile, Scerba testified, Edmond "pleaded with [the defendant] not to kill him." Scerba returned to the bathroom to inject more drugs. When she came out, the defendant got a phone call. Scerba assumed it was "Bubbles" phoning. The defendant "looked like he was pissed" as a result of the call.

¶ 20    At that point, Scerba testified, the defendant "grabbed the gun and made [Edmond] follow him" through the house and toward the garage. (It is not clear which gun the defendant "grabbed.") That was the last time that Scerba ever saw Edmond. Cardell Thomas and Blake Shahan also walked toward the garage. Scerba returned to the bathroom to "get high even more." She was trying to overdose so that she "didn't have to go through all the shit that was happening out there." While she was in the bathroom, Cardell Thomas came back into the house in order to make sure

6

that she did not overdose. Scerba thought that Thomas remained in the house thereafter. Scerba heard gunshots, though she could not specify a number. She heard Edmond say, "aww, like he was taking his last breath." Then, the defendant and Shahan returned to the house.

¶ 21    Scerba told Shahan that she wanted to leave. Scerba, Shahan, and the defendant, together, left Thomas's house. Shahan drove, the defendant sat in the front passenger seat, and Scerba sat in the back. The defendant was dropped off at his and Bubbles's apartment in Centralia.

¶ 22    Scerba remembered being interviewed about these events by police officers on December 6 and 13, 2019. She was "high" those days, too. She did not remember much of what she said during police interviews, but she definitely remembered saying that she did not kill Edmond. She also remembered that Detective Decker took her cell phone—not the cell phone she had bought at Walmart with the money she got from Edmond, but the one that she had used for a while and that had her "contacts" entered.

¶ 23    Blake Shahan testified that he and Krystal Scerba had been friends for years. He knew the defendant and had bought illicit drugs from him. The defendant and "Bubbles" Flippen were boyfriend and girlfriend. Shahan did not know Edmond, but he was familiar with him as "Junior" from their Centralia neighborhood. On December 3, 2019, around midnight, Shahan was with Scerba outside the defendant's apartment. Shahan purchased heroin from the defendant. Then, the defendant told Shahan that Edmond had stolen his money and he wanted it back, and he asked Shahan to drive Scerba to the Industrial Tavern, where Edmond was, and to trick Edmond into leaving the tavern with the two of them. At the time of that conversation, the defendant did not specify exactly where Shahan and Scerba were to take Edmond after they had left the tavern, and the defendant did not indicate what he planned to do with Edmond. Shahan and Scerba went to the Industrial Tavern. A few times, Shahan and Scerba left the tavern but soon returned. While away

7

from the tavern, Shahan and Scerba went to a gas station in order to get money from the defendant to spend at the tavern. Hours went by.

¶ 24    According to Shahan, Scerba convinced Edmond to leave the tavern with them. It was around closing time. They stopped at a Walmart, and Scerba went inside, alone, to buy a cell phone with money provided by Edmond. Shahan and Edmond waited for Scerba in the car. Shahan received a text message from the defendant, providing him with Cardell Thomas's address. When Scerba returned to the car, Shahan drove off the Walmart lot and to Thomas's house.

¶ 25    The three of them—Shahan, Scerba, and Edmond—went inside Thomas's house, according to Shahan. Almost immediately, Thomas started wrestling with Edmond, placing him in a headlock. At first, Shahan simply watched; however, when Edmond pulled a gun from his waistband, Shahan joined the fight, holding Edmond's arm and taking away the gun, and subsequently throwing it onto the floor. The gun was a green .45-caliber automatic. He continued wrestling with Edmond. Before long, though, Edmond appeared to run out of energy, and he sat on the couch. Thomas hit Edmond with a miniature baseball bat.

¶ 26    A few minutes later, Shahan further testified, the defendant arrived at Thomas's house. The defendant was holding a revolver, and he hit Edmond repeatedly with it. Five to ten minutes after the defendant had arrived, "Bubbles" Flippen walked into Thomas's house. The defendant and Flippen talked to Edmond about the missing money, and Edmond told them that it was in a closet. Flippen left Thomas's house in order to see whether she could find the money. Flippen was in Thomas's house for only "a couple of minutes." After some time had passed, the defendant had a telephone conversation. After that conversation, the defendant seemed angry. A blue tarp was in the living room, and either the defendant or Thomas told Shahan to take the tarp to Thomas's garage. Shahan did so, and he spread the tarp on the garage floor. Shahan thought that the tarp

8

would be used exclusively to "scare" Edmond into returning the money. After taking the tarp to the garage, Shahan returned to the house. The defendant and Edmond were still talking about money, with Edmond, looking fearful, telling the defendant that "it was all there." At that point, the defendant, who was holding a gun at his side, and Thomas started to walk Edmond out of the house and to the garage. Shahan and Scerba followed them. Shahan was holding the green .45 that he had taken from Junior.

¶ 27    Shahan further testified that all of them—the defendant, Edmond, Thomas, Scerba, and himself—went into the attached garage. The defendant told Edmond that he wanted his money, and Edmond "pleaded" with the defendant, stating that he had given back all the money. The defendant shot Edmond in the torso three or four times. Thomas said, "hit him again *** he was still breathing," and the defendant shot Edmond two or three more times in the torso.

¶ 28    Shahan realized that his fingerprints might be on the tarp, and he started to panic. The defendant assured him that the tarp would be burned. Shahan and Scerba wanted to leave immediately. The defendant told Shahan to give him a ride. Shahan then drove the defendant and Scerba in his car. He dropped off Scerba, then dropped off the defendant at his apartment, and then drove back to where he was staying. Shahan had kept the green .45-caliber automatic handgun that he had taken from Edmond. A few days later, he traded it with someone (not the defendant) for drugs.

¶ 29    According to Shahan, he was a regular user of heroin and methamphetamine. He had convictions for burglary and various theft and drug crimes.

¶ 30    On cross-examination, Shahan testified that on December 6, 2019, in the evening, Detective Sergeant Decker first attempted to question him about this case, but Shahan said that he knew nothing about the matter. On December 12, Shahan was arrested in this case and was taken

9

to the Marion County jail, where Detectives Decker and Castleman attempted to question him about this case, but Shahan said he did not want to speak with them. Later that day, "Craig Griffin" came to the jail to speak with Shahan, and after their conversation, Shahan changed his mind and agreed to speak with Decker. When asked by defense counsel whether any kind of "deal" was struck in order to persuade him to speak with Decker, Shahan answered, "No." When defense counsel asked him whether he was "hoping for any kind of deal" by agreeing to speak with Decker, Shahan answered, "No."

¶ 31    A few days after his arrest in this case on December 12, 2019, Shahan was charged with the first degree murder of Edmond. This charge was still pending at the time of Shahan's testimony at the defendant's trial.

¶ 32    Cardell Thomas testified that he had an "extensive" criminal history that included drug convictions, and that he was a drug addict. Due to his long-time relationship with the defendant's aunt, Thomas had known the defendant for the defendant's entire life. Thomas "care[d] about" the defendant, though they were not close. Prior to his arrest in this case, he resided on Green Street in Centralia. In early December 2019, the defendant contacted Thomas and said that someone had taken cash from him, and he asked whether he could come by Thomas's house. Thomas agreed, even though he was unsure of the whole situation due to the "cloud of haze" caused by his drug use. Thomas thought that the defendant's request may have had something to do with the fact that Thomas's house was fairly secluded.

¶ 33    Thomas further testified that sometime after midnight, a "gentleman named Blake" (Shahan), "a girl named Krystal" (Scerba), and "the young man that died" (Clender "Junior" Edmond) came to Thomas's house. Thomas had met Scerba on one previous occasion, and he knew her as "a local drug addict like [him]self." He did not know the other two at all. The three

10

did not make it clear to Thomas why they were at his house. Edmond was "fidgeting" with some cash that Thomas had in his kitchen. Thomas "yelled" at Edmond, and Edmond loudly responded, calling Thomas, "bitch." Thomas "spun around and tackled him." Edmond fell to the ground. An automatic handgun fell from Edmond, and Shahan picked it up.

¶ 34 Then, according to Thomas, the defendant arrived at Thomas's house. Thomas remembered some of the events that happened after the defendant's arrival, but his memory was affected by his being "so freaking high." As Thomas recalled, the defendant did not have anything in his hands when he entered the house. In the living room, the defendant loudly told Edmond that he wanted his money. With fear in his voice, Edmond loudly and repeatedly told the defendant that he was "sorry," that he "didn't mean to do it," and that he could get the defendant's money back to him. Edmond was sitting in the love seat when the defendant punched him in the head, causing Edmond to bleed. Thomas knew a young woman named "Bubbles" by sight, but to Thomas's knowledge, she was not at his house that day. The defendant talked on his phone. Again, the defendant punched Edmond in the head and yelled that he wanted his money. At some point afterward, Thomas saw the defendant holding a green automatic handgun. Thomas thought that the defendant's gun looked different from the gun that fell from Edmond and that Shahan had picked up. Everyone in the house was talking excitedly. Then, the defendant suggested that everyone go to the garage.

¶ 35 Thomas further testified that Edmond, the defendant, Shahan, and he walked toward the garage. The defendant was the only one who had a gun in his hand. Thomas did not actually go into the attached garage; the farthest he went was "the landing," *i.e.*, the doorway between the laundry room and the garage. Due to his fear that Krystal Scerba would steal something from his house, Thomas went "back and forth" between the landing and the main part of the house. From

11

the landing, Thomas could easily see into the garage. He witnessed the defendant, still holding his gun, instruct Edmond to lie down on a blue tarp that Thomas kept in the garage. Edmond did as instructed. The defendant stood on one side of Edmond, while Shahan stood on his other side. Both the defendant and Shahan held guns, perhaps at their sides, and were talking to Edmond. Once, as Thomas was walking back toward the landing after checking on Scerba, he saw and heard the defendant fire "three, four, maybe five" shots from his gun at Edmond. Thomas "yelled" in "fear." He did not anticipate anything like a shooting. He thought Edmond had moved and said, "Looks like he's still moving." After making that comment, he did not see Edmond move again. "The rest of the evening was kind of a fog and/or haze," said Thomas. The defendant, Shahan, and Scerba departed Thomas's house. Edmond was "laying in the garage dead."

¶ 36    In concluding his testimony, Thomas testified that later in the day, the defendant returned to Thomas's house. The defendant and Thomas removed Edmond's body, which was in the blue tarp, from the floor of Thomas's garage and placed it in the back of Thomas's truck. They drove the truck down to a burn pile on Thomas's property. There, they placed Edmond's body on the pile and doused it with gasoline. The defendant then lit the body on fire. A few days later, Thomas knew that in his laundry room, there was still a black trash bag that contained bloody, personal possessions taken from Edmond. Thomas did not know whether the defendant, Blake Shahan, or Krystal Scerba had taken those possessions from Edmond, but Thomas knew that he had not taken them.

¶ 37    DNA evidence showed that Edmond's blood was on a white t-shirt that was found in the black trash bag in Thomas's laundry room. Edmond's blood also was found on a wall in Thomas's living room, behind the couch.

¶ 38    Phone records showed that a telephone linked to the defendant was being used in the early-morning hours of December 3, 2019. It was used, repeatedly, to phone or text Blake Shahan, Cardell Thomas, and others. At approximately 6 a.m., the defendant's phone was used to call "Bubbles" Flippen's phone, and records indicated that the location of the defendant's phone was, at that time, consistent with Cardell Thomas's residence.

¶ 39    Two people who lived in the same neighborhood as Cardell Thomas provided corroborating evidence. They testified that on December 3, 2019, at approximately 6 a.m., they heard gunshots.

¶ 40    An autopsy revealed that Edmond died as the result of two gunshot wounds to the chest. He was alive at the time he was shot, but he was already dead at the time his body was burned. Two .32-caliber bullets were recovered from Edmond's body. The bullets were likely fired from an automatic firearm.

¶ 41    The defendant chose not to testify. The defense chose not to present a case in chief.

¶ 42    Closing arguments were made. The court found the defendant guilty of first degree murder, as charged in count I.

¶ 43    In October 2020, the court held a sentencing hearing. The court sentenced the defendant to 55 years of imprisonment, to be followed by 3 years of mandatory supervised release. The 55-year sentence included the 25-year enhancement for personally discharging a firearm and causing Edmond's death.

¶ 44    After the court imposed sentence and admonished the defendant about his appeal rights, the defendant told the court that he "want[ed] to raise ineffective counsel," and he asked the court how he could do that. The court answered that he should speak with his trial attorney. Thus, the sentencing hearing ended. The defendant appealed from the judgment of conviction.

¶ 45    On direct appeal, this court remanded this cause for a preliminary inquiry on the defendant's suggestion of ineffective assistance of trial counsel. *People v. Duncan*, 2023 IL App (5th) 200283-U. Apparently, the cause remains in the circuit court.

¶ 46                          *The Section 2-1401 Petition*

¶ 47    On July 22, 2022, the defendant filed with the circuit court a section 2-1401 petition for relief from judgment. That petition is the subject of the instant appeal. The defendant claimed that the State, in order to convict him, had intentionally used perjured testimony at his trial. According to the defendant, Blake Shahan had testified that he was not testifying against the defendant pursuant to a "deal" with the State, but in reality, sometime after the defendant's trial concluded, the State amended Shahan's charge of first degree murder to the less serious charge of second degree murder, and Shahan pleaded guilty to the amended charge. For this alleged deprivation of his right to due process, the defendant sought vacatur of the judgment and sentence in this case.

¶ 48    Two documents were attached to the section 2-1401 petition. The first document was an affidavit from the defendant, which stated that he "was present at the bench trial at which Blake Shahan testified to not receiving any deal for his testimony." The second document was a transcript of a hearing held on November 17, 2020, in Marion County case number 19-CF-471, the People of the State of Illinois versus Blake Shahan. During that hearing, the defendant in that case, Shahan, pleaded guilty pursuant to a fully negotiated plea agreement with the State. Shahan pleaded guilty to an amended charge of second degree murder in regard to Edmond, and he was sentenced to the agreed-upon 17 years of imprisonment plus 2 years of mandatory supervised release.

¶ 49    In January 2023, the State filed a motion to dismiss the petition for relief from judgment. According to the State, the defendant had failed to provide any affidavit or other appropriate showing in support of his claim.

14

¶ 50    On July 13, 2023, the circuit court entered a written order in the case. The court found, *inter alia*, that "[t]he alleged facts and the record do not support the conclusion that Blake Shahan presented false testimony regarding a deal for his testimony. \*\*\* To find substance in the conclusion of false testimony, the court would have to find that the deal was reached within hours of the Defendant's arrest in December 2019. The record doesn't even suggest this." The court, *inter alia*, dismissed the defendant's section 2-1401 petition.

¶ 51    The defendant filed a timely notice of appeal from the dismissal order. The court appointed OSAD to represent him on appeal.

¶ 52                                                    ANALYSIS

¶ 53    This appeal is from an order that dismissed the defendant's petition for relief from judgment, which the defendant filed pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2022)). As previously noted, the defendant's court-appointed attorney has filed a *Finley* motion to withdraw as counsel. In its accompanying legal memorandum, OSAD suggests one potential issue in this appeal—whether the circuit court erred in dismissing the defendant's section 2-1401 petition with its claim that the State had knowingly presented perjured testimony from Blake Shahan. This court finds that the circuit court did not err in its dismissal of the petition.

¶ 54    Section 2-1401 is intended to correct errors of fact, unknown to the petitioner and the circuit court at the time of the judgment, which would have prevented entry of the judgment if those facts had been known. *People v. Pinkonsly*, 207 Ill. 2d 555, 566 (2003). To be entitled to relief under section 2-1401, a petitioner must set forth specific factual allegations supporting each of these three elements: (1) the existence of a meritorious defense or claim, (2) due diligence in presenting this defense or claim to the circuit court in the original action, and (3) due diligence in filing the

15

section 2-1401 petition. *Id.* at 565. "That is, in order to obtain relief under section 2-1401, the defendant must show both a meritorious defense to the charges against him and due diligence in presenting it." *Id.* Section 2-1401 authorizes a circuit court "to vacate or modify a final order or judgment in civil and criminal proceedings." *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. The circuit court may dismiss a section 2-1401 petition if the facts alleged do not state a legal basis for the relief requested. *People v. Vincent*, 226 Ill. 2d 1, 8-10 (2007). Dismissal of a petition for relief from judgment is reviewed *de novo*. *Id.* at 18. This court may affirm the circuit court's judgment "on any basis supported by the record, regardless of the actual reasoning or grounds relied upon by the circuit court." *People v. Harvey*, 379 Ill. App. 3d 518, 521 (2008).

¶ 55    To be entitled to relief under section 2-1401 on the basis of perjured testimony, a defendant must show, by clear and convincing evidence, that the testimony was not merely false, but willfully and purposefully given, material to the issue tried and not merely cumulative, and that it probably controlled the determination. *People v. Sanchez*, 115 Ill. 2d 238, 286 (1986).

¶ 56    Here, the defendant did not even reach the threshold of that which was required of him, *i.e.*, he failed to show, by clear and convincing evidence, that Blake Shahan's trial testimony was false. Shahan testified at trial that on the day of his arrest in this case—December 12, 2019—Detectives Decker and Castleman attempted to question him, but Shahan said he did not want to speak with them. Later that same day, "Craig Griffin" came to speak with him at the jail, and after their conversation, he changed his mind and agreed to speak with Decker. When Shahan was asked by the defendant's trial counsel whether any kind of "deal" was struck in order to persuade him to speak with Decker, Shahan answered, "No." When trial counsel asked him whether he was "hoping

16

for any kind of deal" by agreeing to speak with Decker, Shahan answered, "No." Such was Shahan's actual, transcribed testimony at the defendant's trial in mid-August 2020.

¶ 57    In his section 2-1401 petition, which was filed with the circuit court on July 22, 2022, the defendant alleged that Shahan had testified at trial that he was not testifying against the defendant pursuant to a "deal" with the State. In other words, the defendant alleged that Shahan had denied that a "deal" with the State was the impetus for his trial testimony. However, as just noted, what Shahan actually denied was that a "deal" with "Craig Griffin" was the impetus for his agreeing to speak with Detective Decker. Denying the existence of a "deal" with the State to testify at a trial is different from denying a "deal" to speak with a police detective. In addition, Shahan's denial that he was "hoping for any kind of deal" by agreeing to speak with Decker was also different from the allegation in the section 2-1401 petition. "Hoping for a deal" is something purely subjective, and it differs from a denial that a "deal" with the State was the impetus for trial testimony. The principal allegation in the section 2-1401 petition—that Shahan testified that he was not testifying pursuant to a "deal" with the State—is simply not true. There is no indication that Shahan provided false testimony at the defendant's trial. Certainly, there is no clear and convincing evidence that his testimony was false.

¶ 58    Shahan testified at the defendant's trial in mid-August 2020 under a grant of use immunity, entered by the circuit court in late-July 2020. The grant of use immunity was the impetus for Shahan's testimony at the trial. Three months after the trial, on November 17, 2020, Shahan pleaded guilty to the second degree murder of Edmond, pursuant to a fully negotiated plea agreement with the State. There is no reason to imagine that a plea agreement, involving testimony at the defendant's trial, was struck at the time of Shahan's arrest in December 2019. Or, in the words of OSAD's *Finley* memorandum, "[i]t is not reasonable to believe that the State and Shahan

17

had a deal for a short sentence to a reduced charge (17 years DOC to second degree murder) when the State had to legally force Shahan to testify against [the defendant]." The defendant's perjury allegation fails.

¶ 59                                CONCLUSION

¶ 60    There is no merit to the argument that the circuit court erred in dismissing the defendant's section 2-1401 petition. That is because the defendant provided no clear and convincing evidence that Blake Shahan committed perjury at the defendant's trial. Accordingly, OSAD is granted leave to withdraw as the defendant's attorney in this appeal, and the judgment of the circuit court is affirmed.


¶ 61    Motion granted; judgment affirmed.